IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
                          EASTERN DIVISION

        ------------------------------------

        TRANSTAR INDUSTRIES, LLC,

                        Plaintiff,

                vs.

        TIM LUNDQUIST, et al.,

                        Defendants.

        ------------------------------------


                The Videoconference Deposition of
        TIM LUNDQUIST, taken pursuant to Notice of
        Taking Deposition, taken before Laurie A.
        Kjelden, a Notary Public in and for the
        County of Ramsey, State of Minnesota, on the
        17th day of March, 2021, via Zoom,
        commencing at approximately 8:00 a.m.
        Central, 9:00 a.m. Eastern.



                       Magna Legal Services
                          866-624-6221
                         www.MagnaLS.com



Page 2

```
 1   APPEARANCES:
 2
       ON BEHALF OF THE PLAINTIFF VIA ZOOM:
 3
                DAVID A. CAMPBELL
 4              Y. TIMOTHY CHAI
                Lewis Brisbois Bisgaard & Smith LLP
 5              1375 East 9th Street
                Suite 2250
 6              Cleveland, Ohio 44114
                David.A.Campbell@lewisbrisbois.com
 7              Timothy.Chai@lewisbrisbois.com
 8
       ON BEHALF OF THE DEFENDANTS VIA ZOOM:
 9
                BRIAN KAMPMAN
10              Ziegler Metzger LLP
                1111 Superior Avenue
11              Suite 1000
                Cleveland, Ohio 44114
12              Bkampman@zieglermetzger.com
13
       ALSO PRESENT VIA ZOOM:
14
                Meagan Donohoe-Technician
15
16                      ***
17
             DEPOSITION OF TIM LUNDQUIST
18
19   Examination:                      Page
20   Mr. Campbell                        3
21   Exhibits:                         Page
22   1 Account Application             27
     2 Ledger                          56
23
24
25
```



```
 1                  P R O C E E D I N G S
 2         (Witness sworn)
 3                        TIM LUNDQUIST
 4         called as a witness, being first duly sworn,
 5            was examined and testified as follows:
 6                         *   *   *
 7                        EXAMINATION
 8                         *   *   *
 9         BY MR. CAMPBELL:
10    Q.   Okay.  Mr. Lundquist, could you please state
11         your name for the record?
12    A.   Timothy Lundquist.
13    Q.   Could you spell Lundquist for the record?
14    A.   L-U-N-D-Q-U-I-S-T.
15    Q.   And what is your current business address?
16    A.   It is 875 Corporate Drive, Jordan, Minnesota
17         55352.
18    Q.   Okay.  Have you ever been through a
19         deposition before?
20    A.   No.
21    Q.   Okay.  I'm sure your counsel has given you
22         instructions.  I will give you mine.
23                   First of all, if -- as you're
24         doing, if you wait to answer until I'm done
25         with my question, it will be a lot easier
```



```
 1          for of the court reporter.
 2                  Do you understand that?
 3   A.    Yes.
 4   Q.    Secondly, as you're doing, if you just
 5          answer verbally.  Especially online, we
 6          don't always -- if you're just nodding, we
 7          may not even see you on the screen.  So if
 8          you could say yes or no or give us a verbal
 9          answer.  Okay?
10   A.    Okay.
11   Q.    If you need a break at any point, if you
12          need to talk to your counsel or you just
13          need to get a cup of coffee, just speak up.
14          Okay?
15   A.    Okay.
16   Q.    I would prefer that you answer my question
17          before taking a break but if you think you
18          need to talk to your counsel before
19          answering, we can take a break and give you
20          that opportunity but we need to state that
21          on the record.  Okay?
22   A.    Okay.
23   Q.    And if you need any explanation for my
24          question, if you need me to repeat anything,
25          if you don't understand something, just
```



Page 5

```
 1        speak up.  Okay?
 2   A.   Yes.
 3   Q.   Okay.  So are you on any medication that
 4        could impact your ability to testify
 5        truthfully here?
 6   A.   No.
 7   Q.   Let me ask you a little bit about your
 8        business.
 9             Where do you work?
10   A.   Dynotec Industries.
11   Q.   And do you -- how are you paid by Dynotec?
12   A.   I'm a salary employee.
13   Q.   So you get paid W-2 wages?
14   A.   Correct.
15   Q.   How many employees do you have today?
16   A.   I don't know.  I would have to count.  I
17        think 20 exact today.
18   Q.   20 employees today.  Okay.
19             Is your wife an employee?
20   A.   She is.
21   Q.   What's her name?
22   A.   Jody, J-O-D-Y, Lundquist.
23   Q.   What is her position?
24   A.   She is like an office manager, does accounts
25        receivable, payable.
```



1  Q.  So Dynotec is in business today?

2  A.  Correct.  Yes.

3  Q.  Okay.  Does Dynotec have any other -- tell

4      me this:  What is Dynotec's business?

5  A.  Remanufacturing automatic transmissions.

6  Q.  Okay.  And tell us what -- tell us that

7      process in simple terms, Mr. Lundquist, on

8      remanufacturing automatic transmissions.

9  A.  We take what we would call a core

10     transmission, a bad or failed transmission,

11     disassemble it, renew the internals, test it

12     and then sell it as a renewed product.

13 Q.  Okay.  And what are, like, the primary

14     customer base?  What's primary customer base

15     today?

16 A.  General repair facilities, salvage yards,

17     dealer network, like new car dealer.

18 Q.  Okay.  Do you do business with Transtar

19     today?

20 A.  No.

21 Q.  When did that end?

22 A.  Approximately early July 2020.

23 Q.  Why did it end?

24 A.  Unsettled payments.

25 Q.  Okay.  And as to Transtar, how long was



```
 1           Dynotec doing business with Transtar?
 2    A.     I don't remember the date on the
 3           application, but I think it was 2007.
 4    Q.     Going off of -- and we'll show it to you
 5           later.
 6                   But are you going off of that
 7           account application?  Is that what you're
 8           basing it on?
 9    A.     Yes.
10    Q.     Did the relationships start with that
11           account application being executed?
12    A.     No.  I had bought from them before that.
13           That was -- that was when Dynotec was
14           starting to purchase at that point.
15    Q.     When you say "at that point," when you
16           signed that account application?
17    A.     No.  We had been buying before that.  I just
18           don't know the timeline.
19    Q.     Okay.  When you were buying before that, was
20           it -- you would come in and actually pay or
21           charge on delivery?
22    A.     Yes.
23    Q.     Okay.  So you would come in and buy whatever
24           parts you needed in order to utilize those
25           in your remanufactured automatic
```



```
 1        transmissions?

 2   A.   Yes.

 3   Q.   Now, on the Transtar relationship, just so I

 4        understand it in simple terms, on the one

 5        hand, Dynotec would purchase transmission

 6        parts from Transtar; is that right?

 7   A.   Say that again, please.

 8   Q.   On the one hand, Dynotec was a customer who

 9        would purchase the products that Transtar

10        sells to its customers, right?

11   A.   Yes.

12   Q.   What type of products would Dynotec

13        typically purchase from, let's say, 2009

14        through 2020?

15   A.   That's a really broad question.  Just any --

16        any of their product line that would benefit

17        us to rebuild a transmission.

18   Q.   Okay.  So that's one piece of the

19        relationship.  The other piece was Transtar

20        would actually purchase finished products

21        from Dynotec.

22                  Is that a fair statement?

23   A.   Correct.

24   Q.   When they purchased those finished products,

25        is there a core charge?  What is that?
```



1   A.   There is a charge for the finished product,

2        and a charge for the -- what would be the

3        core as a returned product.

4   Q.   Okay.  And explain that to somebody who

5        doesn't understand transmissions.

6   A.   When we're rebuilding a transmission, you

7        obviously need to start with a core to

8        create a renewed product.  So when you send

9        that product out, you need to have that core

10       back to start the cycle over again.

11  Q.   Okay.  What is the typical charge, the core

12       charge?

13  A.   You know, I -- that's a tough one to answer

14       because it's low to high as far as pricing

15       goes.  So I mean -- I don't know.  I would

16       have to look it up to give you an honest

17       answer.

18  Q.   What in general is it based upon?

19            I mean, when you say, here's a

20       core charge when you're selling a

21       remanufactured automatic transmission, what

22       is that core charge based upon?

23  A.   Well, one would be whatever you were able to

24       purchase that core for, and then generally,

25       you know, you would add some value to it so



```
 1        that it gets returned.  A lot of times they
 2        won't return the core if the core price
 3        isn't high enough.
 4   Q.   So explain how it would work.  Let's say
 5        just a customer -- let's say I'm at Bob's
 6        transmission and I'm doing -- you know, and
 7        I repair transmissions and other auto
 8        problems for my customers.  I'm in a corner
 9        of Minnesota.  Okay?
10   A.   Yup.
11   Q.   And I come to you, and I say, hey, Dynotec,
12        I need a remanufactured automatic
13        transmission for -- pick a car -- Ford
14        Escort for 1989.  Whatever it may be.
15                 So you have it, you're going to
16        sell it to me, number one, right?
17   A.   Yes.
18   Q.   And I'm going to go pay a certain price for
19        that transmission?
20   A.   Yes.
21   Q.   And then you're going to add a core charge
22        to that?
23   A.   Yes.
24   Q.   Okay.  Now, what do I do?  If I'm Bob's
25        Transmission, I go and I put the -- when I
```



Page 11

```
 1          purchase it from Dynotec, I put it into my

 2          customer's car.

 3                    What do I return to Dynotec?

 4    A.    You return the transmission that came out of

 5          the vehicle.

 6    Q.    Okay.  So then I'm getting into the Ford

 7          Escort.  In my example, I'm replacing the

 8          transmission, and whatever I take out of

 9          that car I bring back to you, then I'm

10          supposed to get that core charge back?

11    A.    Correct.

12    Q.    And when I bring it back, it's a used

13          transmission that wasn't working.

14                    What do I -- what obligations do

15          I have in order to get that core charge

16          back?

17    A.    The first is a visual.  Is it complete?  And

18          is it not broken?  Otherwise, there would be

19          charges of some sort for damaged product,

20          sometimes up to the full value.

21    Q.    And who makes that decision?

22    A.    It would be management here when it was --

23          you know, the shipping manager or the shop

24          foreman, you know, depending on who sees it

25          first.
```



Page 12

```
 1   Q.   So I could bring back the core, the used
 2        transmission, in other words, right?  The
 3        used transmission for that Escort I'm
 4        bringing back?
 5   A.   Yes.
 6   Q.   And then Dynotec could look at it and say,
 7        we're not giving you all or some of that
 8        core charge back?
 9   A.   Yes.
10   Q.   And if I never bring back the core, I'm
11        never getting that money back?
12   A.   Yes.
13   Q.   What does Dynotec do with the core charge --
14        when I'm Bob's Transmission and I pay, where
15        is that core charge kept?
16                  Is it just kept in your general
17        books, or is it kept in some segregated
18        account?
19   A.   I don't know at this point.  I couldn't -- I
20        don't handle that paperwork side, so I
21        couldn't honestly answer where, but, you
22        know, that -- yes.
23   Q.   If somebody doesn't bring back the core, is
24        that considered income to Dynotec?
25   A.   I don't know how that is handled on that
```



1      paperwork side.

2  Q.  If I bring back the core and you reject it,

3      so to say, you say that it's damaged, do you

4      keep the core, or do you return it to me?

5  A.  That would depend on the customer.

6  Q.  Okay.  And then do you -- does Dynotec

7      consider that -- if you were to reject the

8      core, does Dynotec consider the core charge

9      as income?

10 A.  I would say no, because the core -- we'd

11     have to replenish the core, so it would have

12     to be bought again.  So the money would be

13     used to repurchase core.

14 Q.  Okay.  So Transtar was purchasing

15     remanufactured automatic transmissions from

16     Dynotec, and then they would be charged a

17     core charge based on the transmission that

18     was purchased?

19 A.  Yes.

20 Q.  Okay.  So there was money -- and during this

21     relationship, there was monies going both

22     ways, at least supposed to be?

23          When Dynotec purchased product

24     from Transtar, there would be a payment to

25     Transtar, right?



Page 14

```
 1   A.   Yes.
 2   Q.   And vice versa.  If Transtar said, we need
 3        some remanufactured transmissions, Dynotec,
 4        here's the ones we need, they would pay for
 5        those remanufactured transmissions, number
 6        one, right?
 7   A.   Yes, they're supposed to.
 8   Q.   With an extra core charge?
 9   A.   Yes.
10   Q.   Was there any other -- I guess, any other
11        flows of money between the two entities
12        during this 10-plus year relationship?
13   A.   No.
14   Q.   Okay.  Okay.  What do your employees --
15        aside from you and your wife, what do the
16        employees do at Dynotec?
17   A.   I mean, it obviously depends on the position
18        that they hold, whether it's shipping,
19        testing, sales, or the actual handling of
20        the rebuilding of the transmission.
21   Q.   Okay.  Now let me ask you this:  Where does
22        Dynotec typically -- where is your customer
23        base?  Is it Minnesota?  Is it nationwide?
24   A.   Our strongest base is in Minnesota.
25   Q.   Okay.
```



Page 15

```
 1   A.   We do ship some stuff nationwide, but a very
 2        small portion.
 3   Q.   What percentage of your business is
 4        Minnesota-based?
 5   A.   80-plus percent without actually looking at
 6        numbers.
 7   Q.   Okay.  Okay.  Now, what is the typical --
 8        what's the annual revenue for Dynotec in a
 9        typical year?
10   A.   I couldn't answer that right now.  I don't
11        know.  I would -- I would have to look it
12        up.
13   Q.   You don't have even a ballpark of what your
14        annual revenue is?
15   A.   I don't at the moment.
16   Q.   You don't at the moment.
17             You can't tell me for any of the
18        years what your sales were?
19   A.   No.  I don't know the numbers right now.
20   Q.   Do you have a projection for this year's
21        sales?
22   A.   I don't.
23   Q.   You don't.  Okay.
24             So you have no idea on what your
25        revenue would be.
```



Page 16

```
 1                   Who would have that, your wife?
 2    A.    Yes.
 3    Q.    So do you partake in the books at all?  Are
 4          you at all involved in them?
 5    A.    I am very little involved to almost nothing.
 6    Q.    Okay.  And so -- so -- and let me ask you:
 7          Who is reviewing the core when it comes in
 8          to determine whether the core -- all or some
 9          of the core charge should be returned?
10    A.    Currently?
11    Q.    Currently first.
12    A.    Are you looking for a name or...
13    Q.    I mean, is it you or your wife, or who in
14          general?  Is this an employee or -- who does
15          this?
16    A.    It would be an employee.
17    Q.    Has that always been the case over the last
18          10 years?
19    A.    Yes.
20    Q.    What position?  Is there a title of an
21          employee who would review the cores?
22    A.    Generally it would be a shipping manager.
23          We don't currently have one.
24    Q.    Okay.  Who is doing it today?  Who would do
25          the core?
```



Page 17

```
 1   A.   Our shop foreman would review it today.
 2   Q.   And has Dynotec in the last five years had
 3        any other the customers -- customer disputes
 4        over core charges?
 5   A.   No.
 6   Q.   Is Dynotec involved in any other civil
 7        litigation other than the Transtar
 8        litigation?
 9   A.   No.
10   Q.   Are you involved in any other litigation
11        other than -- any other civil litigation
12        other than the Transtar litigation?
13   A.   No.
14   Q.   What entity has taken over Transtar's role
15        as to selling transmission parts to Dynotec?
16   A.   Can you -- can you ask me again?
17   Q.   Presumably in 2020 or in 2019, if you needed
18        parts for your remanufactured transmission
19        beyond the core, you would go to Transtar
20        and say, Transtar, we need X-Y and Z parts,
21        right?
22   A.   Yes.
23   Q.   Who do you go to today?  Who's taken over
24        that role?
25   A.   Multiple vendors.
```



Page 18

```
 1    Q.    Can you name any of them?
 2    A.    We're buying direct from the suppliers now,
 3          like TransGo, Raybestos.
 4    Q.    Okay.  Are you buying on credit or charge on
 5          delivery?
 6    A.    Both.
 7    Q.    What entities do you have credit with?
 8    A.    I don't know at the moment without looking
 9          it up to tell you.
10    Q.    Okay.  And on the credit, has -- well, let
11          me ask you just so the record is clear:  Is
12          Dynotec also involved in some tax disputes
13          with the IRS?
14                    MR. KAMPMAN:  Objection.  Seeks
15          disclosure of private and sensitive
16          information.
17                    But, Tim, you can go ahead and
18          answer this particular question.
19                    THE WITNESS:  Yes, Dynotec is
20          involved in some tax litigation.
21    BY MR. CAMPBELL:
22    Q.    Okay.  And is the IRS looking at you
23          personally for tax liability, as well?
24                    MR. KAMPMAN:  Objection.
25          Disclosure of private and sensitive
```



1       information.  I'm going to instruct him not

2       to answer that question.

3                   MR. CAMPBELL:  You're telling him

4       he's not allowed to answer that question?

5                   MR. KAMPMAN:  Correct.

6                   MR. CAMPBELL:  And what basis are

7       you saying that?

8                   MR. KAMPMAN:  Private and

9       sensitive confidential information.

10                  MR. CAMPBELL:  You realize he's

11      an individual defendant who has personally

12      guaranteed this debt?

13                  MR. KAMPMAN:  I do.

14                  MR. CAMPBELL:  Okay.  So I think

15      we're going to have to court on that.  So

16      why don't we -- because I'm not going to go

17      through this deposition and come back a

18      second day as to -- you're not going to let

19      him answer anything as to the IRS?

20                  MR. KAMPMAN:  Correct.

21                  MR. CAMPBELL:  Okay.  Well, then,

22      let's call the court.  Why don't we take a

23      break, and we'll call the court because,

24      Brian, we're not going to go through this

25      deposition and come back a second time.  You



Page 20

1       guys just want to delay and just play the

2       games and -- you guys are getting your

3       money, so you can delay and keep this thing

4       going, but we've got to call the court,

5       because he's an individual defendant, and

6       we're not going to let it go forward with a

7       personal, private information.  He's an

8       individual defendant.

9                   MR. KAMPMAN:  Okay.  Then we can

10      call the court.

11                  MR. CAMPBELL:  Okay.  I will --

12      why don't we take a break.  I'll e-mail the

13      court, and we'll see if we can get on a call

14      with the court.  Thanks a lot.  I will let

15      you know.

16                  We'll be back on here -- and just

17      so I'm clear, what is exactly -- you're just

18      saying it's personal.  Say that again.

19                  MR. KAMPMAN:  Private,

20      confidential, and sensitive information that

21      has no relevance to this case.

22                  MR. CAMPBELL:  Okay.  Okay.  We

23      will jump on with the court.  We'll take a

24      break here at 9:23.  And, Brian, I will

25      e-mail, and we'll jump on with the court.



Page 21

```
 1          Thanks a lot.  We'll come back hopefully in
 2          the next 10 minutes with the court on.
 3                    MR. KAMPMAN:  Okay.
 4                    (At this time a recess was held.)
 5     BY MR. CAMPBELL:
 6     Q.   Mr. Lundquist, let me ask you about the
 7          Dynotec IRS proceeding.
 8                    What years are at issue in the
 9          Dynotec IRS proceeding?
10     A.   2013 through 2017, if I recall correctly.
11     Q.   Okay.  Is Dynotec challenging the tax
12          liabilities, or what is the petition -- to
13          your knowledge, what is the petition doing
14          in the tax court?
15     A.   I don't know at this point.
16     Q.   You don't know.
17                    What is the issue with the 2013
18          to 2017 tax returns?
19     A.   Payroll tax liabilities.
20     Q.   Anything else?
21     A.   No.
22     Q.   When you say "payroll tax liabilities," what
23          do you mean?
24     A.   Unpaid payroll taxes.
25     Q.   Were you classifying employees as
```



Page 22

```
 1        independent contractors?
 2   A.   No.
 3   Q.   So they were employees, and the IRS is
 4        claiming that you did not -- you withheld
 5        federal taxes from the employee paychecks
 6        but did not pay that to the federal
 7        government?
 8               MR. KAMPMAN:  Objection.
 9        Leading.
10               Go ahead and answer, Tim.
11               THE WITNESS:  Yes.
12   BY MR. CAMPBELL:
13   Q.   Okay.  What amount is at issue for the --
14        not the penalties, but just the tax -- the
15        income tax -- federal income tax from 2013
16        to 2017?
17               Do you know the ballpark for
18        what's at issue?
19   A.   I think it's right about 1.5 million.
20   Q.   That is the amount of payroll taxes that the
21        IRS claims was not paid to the federal
22        government?
23   A.   Yes.
24   Q.   Okay.  Is there penalties on top of that?
25   A.   Yes.
```



Page 23

1  Q.  Okay.  What are the penalties on top?

2  A.  I don't know.

3  Q.  What is Dynotec's defense to that?

4        Did Dynotec pay the income tax to

5     the federal government?

6        MR. KAMPMAN:  Objection.  That's

7     privileged information as to what the

8     defense is.

9  BY MR. CAMPBELL:

10  Q.  Let me ask you this:  Mr. Lundquist, did

11     Dynotec pay the income taxes from 2013 to

12     2017 to the federal government on behalf of

13     its employees?

14  A.  No.

15  Q.  Why is that?

16  A.  Short on funds, trying to keep the business

17     running.

18  Q.  Has Dynotec disclosed the IRS, I'll call it,

19     dispute or litigation to any of its vendors?

20  A.  No.

21  Q.  Why not?

22  A.  Trying to solve the tax liabilities and keep

23     the company running at the same time.

24  Q.  Okay.  If an entity was giving credit to

25     Dynotec, don't you think that they should



Page 24

```
 1           understand that issue as to the fact that
 2           there is more than $1.5 million at issue?
 3                       MR. KAMPMAN:  Objection.
 4                       Go ahead and answer, Tim.
 5                       THE WITNESS:  Yes.  Yes.
 6      BY MR. CAMPBELL:
 7   Q.   Why has Dynotec not disclosed it then?
 8   A.   Like I said just a minute ago, we were
 9           trying to solve that and continue business
10           and at that point was not looking at it to
11           be a problem to move forward for the future.
12   Q.   Well, it's not solved to date, right?
13   A.   It is not.
14   Q.   Does Dynotec have any plans to notify its
15           vendors of the tax liability?
16                       MR. KAMPMAN:  Objection.
17                       Go ahead and answer, Tim.
18                       THE WITNESS:  Not at this point.
19      BY MR. CAMPBELL:
20   Q.   Okay.  Did -- and I assume that when we talk
21           about vendors -- did you or anybody else on
22           behalf of Dynotec disclose this issue to
23           Transtar during your relationship with
24           Transtar?
25   A.   No.
```



Page 25

```
 1   Q.   Why not?
 2   A.   Same thing I said a few minutes ago, was
 3        trying to get it solved and moved forward
 4        with doing business.
 5   Q.   When was the first time that the IRS raised
 6        an issue with respect to payroll taxes with
 7        Dynotec?  What year?
 8   A.   I don't remember.
 9   Q.   Was it 2018, or was it prior to?
10   A.   I don't remember.
11   Q.   And is Dynotec paying its payroll taxes
12        today?
13   A.   Yes.
14   Q.   Does Dynotec have any other -- you told me
15        there's no litigation.
16             Does Dynotec have any other debts
17        in dispute, whether they're valid or not?
18             Is there any other informal
19        disputes going on with either vendors,
20        banks, or any other third parties?
21             MR. KAMPMAN:  Objection.
22             Go ahead and answer, Tim.
23             THE WITNESS:  No.
24        BY MR. CAMPBELL:
25   Q.   Did Dynotec get a PPP loan?
```



Page 26

```
 1    A.    Yes.

 2    Q.    Was the PPP loan available even with a

 3          federal tax liability outstanding?

 4    A.    Yes.

 5    Q.    How many rounds of PPP loans did Dynotec

 6          get?

 7                    MR. KAMPMAN:  Objection.

 8                    Go ahead and answer.

 9                    THE WITNESS:  Two.

10    BY MR. CAMPBELL:

11    Q.    What was the total amount of the PPP loans?

12                    MR. KAMPMAN:  Objection.

13                    Go ahead and answer, Tim.

14                    THE WITNESS:  I don't -- I don't

15          know right now.  It would have to be looked

16          up.

17    BY MR. CAMPBELL:

18    Q.    Do you have a ballpark?

19    A.    I don't.

20    Q.    You don't.

21                    Was it the over a million

22          dollars?

23    A.    No.

24                    MR. CAMPBELL:  Okay.  Let me see

25          what exhibit we will put up.
```



Page 27

```
 1                    Meagan, could you put up
 2         Exhibit 1?
 3                    (Lundquist Deposition Exhibit
 4         Number 1 was marked for identification.)
 5                    MR. CAMPBELL:  Okay.  And why
 6         don't we, first of all, go to Page 2 of
 7         Exhibit 1, Meagan.  And if we could blow up
 8         the bottom, the small print and the
 9         signature there.  Okay.
10         BY MR. CAMPBELL:
11    Q.   Mr. Lundquist, do you recognize that
12         signature?
13    A.   Yes.
14    Q.   Is that your signature?
15    A.   Yes.
16                    MR. CAMPBELL:  And, Meagan, could
17         you make that a little bigger?  Maybe it's
18         there.  I can't see the date because of my
19         screen on the right.  Could you move it over
20         to the left a little bit just so I can see
21         the date?
22         BY MR. CAMPBELL:
23    Q.   Do you see the date, Mr. Lundquist?
24    A.   Re.
25    Q.   And it's dated 3-26-2009?
```



Page 28

1    A.    Yes.

2    Q.    And it's your recollection that Dynotec was

3          doing business with Transtar prior to March

4          26, 2009?

5    A.    Yes.

6    Q.    What is this document that you signed?

7    A.    An account application.

8    Q.    Okay.  And why -- what was your

9          understanding of why you signed it on

10         behalf -- well, first of all, did you sign

11         this on behalf of Dynotec yourself?

12               Who did you sign it on behalf of?

13   A.    Looking back now, I don't remember, but

14         anytime that we do an application like this

15         in this industry, it would be on behalf of

16         Dynotec.

17   Q.    Okay.  And I take it that you do, in the

18         ordinary course of business, sign these

19         types of documents on behalf of Dynotec?

20   A.    Yes.

21   Q.    Okay.

22               MR. CAMPBELL:  And then let's go

23         to Page 1.  Again, Meagan, if we could go to

24         Page 1, we'll come back.  And let's just go

25         through this.  If you could -- first section



Page 29

```
 1        up top from account application through the
 2        first section, blow it up just so we can go
 3        through some of that.
 4        BY MR. CAMPBELL:
 5   Q.   So first of all, it's been marked as a
 6        credit application.  Do you see that,
 7        Mr. Lundquist?
 8   A.   Yes.
 9   Q.   Who marked that?  Who filled this in?  Is
10        this you or Transtar?
11   A.   I would assume Transtar did.  It is not my
12        writing.
13   Q.   It's not your writing.  Okay.
14               And what is COD?
15   A.   Cash on delivery.
16   Q.   Okay.  And was Dynotec cash on delivery
17        prior to the execution of this account
18        application?
19   A.   As far as I remember.
20   Q.   Okay.  And did Dynotec move to a non-cash on
21        delivery account after executing this
22        account application?
23   A.   I would assume, yes.  I don't know the
24        timing of it.
25   Q.   Okay.  You would assume yes because, as of
```



Page 30

```
 1          the timing, you're saying, what, your wife

 2          handled that?

 3    A.    Correct.

 4                    MR. CAMPBELL:  Okay.  Let's go to

 5          the next section.  Okay.

 6          BY MR. CAMPBELL:

 7    Q.    So this -- this started here -- this says

 8          two years at this location.

 9                    Was Dynotec in business just two

10          years prior to this, or what -- explain that

11          to me.

12    A.    Yes, just two years.

13    Q.    And how many employees do you think Dynotec

14          had at this time when you signed this

15          account application?

16    A.    I don't recall, but probably two to three

17          max.

18    Q.    Okay.  So just a new business starting out?

19    A.    Correct.

20    Q.    Okay.

21                    MR. CAMPBELL:  Let's go to the

22          next section, Meagan.

23          BY MR. CAMPBELL:

24    Q.    So this is information of partners,

25          officers.
```



Page 31

```
 1                    Were you president at the time?
 2   A.   Yes.
 3   Q.   Okay.  Is this your home address at the
 4        time, or what is this address?
 5   A.   That was my home address, yes.
 6   Q.   Okay.  Okay.
 7                 MR. CAMPBELL:  Let's move on,
 8        Meagan, to the next section, the last two,
 9        just so we understand this.
10   BY MR. CAMPBELL:
11   Q.   So you were leasing at the time.  Do you
12        still lease that office space?
13   A.   We do have that facility, yes.
14   Q.   Do you lease or purchase -- do you own or
15        lease it?
16   A.   Lease it.
17   Q.   You lease it.  Okay.
18   A.   Yeah.
19                 MR. CAMPBELL:  Let's go to the
20        next page, Meagan.  And why don't you just
21        blow up all those top sections until we get
22        to the -- yes, all those.
23   BY MR. CAMPBELL:
24   Q.   So let's go through.  So you gave some
25        banking information.  Was that accurate at
```



Page 32

```
 1        the time?
 2   A.   Yes.
 3   Q.   Okay.  And then you had to give some of
 4        the -- some references, I guess, to, what,
 5        verify that you were a going concern and
 6        that you could make payments?
 7   A.   I'm assuming, yes.
 8   Q.   Okay.  And who is -- what's this NAPA -- who
 9        is in Nick?  What's this NAPA Chaska?  Is
10        that one of your customers?
11   A.   He was a part supplier at the time.
12   Q.   NAPA Jordan is the same?
13   A.   Correct.
14   Q.   And then Don Robinson with Transtar, what
15        was that relationship?
16   A.   He was our salesperson at Transtar.
17   Q.   That you were working with prior to this?
18   A.   Yes.
19             MR. CAMPBELL:  Okay.  And let's
20        go, Meagan, and blow up that final section
21        there.  We don't need the bottom, just to
22        the signature line so we can see it easier
23        as to -- no, no, no.  The whole box except
24        for the bottom section with those phone
25        numbers.  Yeah.
```



MAGNA
LEGAL SERVICES

Page 33

```
 1        BY MR. CAMPBELL:
 2    Q.  So let's go through this and verify.
 3        Mr. Lundquist, how do you typically -- do
 4        you read these things before you sign, or
 5        what's your typical process?
 6    A.  Yes, for the most part.
 7    Q.  Okay.  You read?
 8    A.  Yeah.
 9    Q.  Okay.  Did you read this before signing?
10            And I know you probably don't
11        have personal recollection, but would you
12        have -- what would be your belief as to
13        this?
14                MR. KAMPMAN:  Objection.
15                Go ahead and answer, Tim.
16                THE WITNESS:  I'm sure I would
17        have skimmed through it before signing it,
18        yes.
19        BY MR. CAMPBELL:
20    Q.  Okay.  Did you maintain a copy of this
21        document?
22    A.  I don't know.
23    Q.  You don't know.  Okay.
24            Do you have a copy of it with the
25        business today, aside from this lawsuit?
```



Page 34

```
 1   A.   I don't know.
 2   Q.   Okay.  And that final bullet point above
 3        your signature, do you recall reading that
 4        about you're the principal and shareholder
 5        of Dynotec?
 6   A.   I don't remember reading it at the time, but
 7        I have read it now, yes.
 8   Q.   Okay.  Was that an accurate statement at the
 9        time?
10   A.   Yes.
11   Q.   Is it an accurate statement today?
12   A.   Yes.
13   Q.   Okay.  And is there anything that you don't
14        understand in that paragraph about the --
15        your responsibilities?
16             MR. KAMPMAN:  Objection.
17        Document speaks for itself.
18             Go ahead and answer, Tim.
19             THE WITNESS:  I mean, I would
20        have to read it in a clearer copy than it is
21        at the moment, but --
22             MR. CAMPBELL:  Meagan, that final
23        bullet point where it says "The undersigned
24        principal and shareholder" so we can all see
25        it and go through it, just make that section
```



MAGNA
LEGAL SERVICES

Page 35

```
 1          so we can see that.  Okay.
 2                   THE TECHNICIAN:  It's coming out
 3          a little bit blurry when I blow it up, so
 4          I'm just trying to make sure it's clear for
 5          you all.
 6                   MR. CAMPBELL:  I think that's as
 7          good as we're going to get right now.
 8     BY MR. CAMPBELL:
 9  Q.     So Mr. Lundquist, I'm going to go through
10          it.  It starts with "The undersigned, the
11          principal and shareholders, of said
12          company."
13                   That was accurate, right?
14          Mr. Lundquist, was that accurate at the
15          time?
16  A.     Yes.
17  Q.     Okay.  And then it says, "expressly agrees
18          to indemnify and hold harmless Transtar
19          Industries, Inc., its affiliates,
20          subsidiaries, successors and assigns."
21                   Did I read that right?
22  A.     Yes.
23  Q.     "Because of extension of credit as contained
24          in this application."
25                   Did I read that right?
```



Page 36

```
 1   A.   Yes.
 2   Q.   "And in the event the undersigned company
 3        fails or refuses to pay any amount due to
 4        Transtar."
 5             Did I read that right?
 6   A.   Yes.
 7   Q.   "The undersigned principals will pay said
 8        amount in full upon demand of Transtar."
 9             Did I read that right?
10   A.   Yes.
11   Q.   "Including all interest, finance charges and
12        attorney's fees in the event it is necessary
13        for Transtar to employ an attorney or other
14        third-party firm to collect same."
15             Did I read that right?
16             MR. KAMPMAN:  Objection.
17             Go ahead and answer, Tim.
18             THE WITNESS:  Yes.
19   BY MR. CAMPBELL:
20   Q.   "Together with the cost of collection.  This
21        application replaces and supercedes any
22        previous credit applications with Transtar."
23             Did I read that right?
24             MR. KAMPMAN:  Objection.
25             Go ahead and answer, Tim.
```



Page 37

```
 1                    THE WITNESS:  Yes.
 2         BY MR. CAMPBELL:
 3    Q.   "Its predecessors, affiliates and
 4         subsidiaries.  This is to certify that I am
 5         a principal of this business and personally
 6         guarantee this account."
 7                    Did I read the final sentences
 8         right?
 9                    MR. KAMPMAN:  Objection.
10                    Go ahead and answer, Tim.
11                    THE WITNESS:  Yes.
12         BY MR. CAMPBELL:
13    Q.   So on this, you don't recall reading it.
14         You said, what, you would have skimmed it
15         or -- what do you recall?
16    A.   I don't remember now.
17    Q.   Okay.  Well, let me ask you this -- and I
18         know that you and Dynotec disagree as to the
19         amounts owed.
20                    But do you agree that if Dynotec
21         is found to have amounts owed to Transtar,
22         that you personally guaranteed those amounts
23         owed?
24                    MR. KAMPMAN:  Objection.
25                    Go ahead and answer, Tim.
```



Page 38

```
 1                    THE WITNESS:  Yes.
 2                    MR. CAMPBELL:  We could pull out
 3         of that exhibit, Meagan.
 4         BY MR. CAMPBELL:
 5   Q.    So after this account application was
 6         executed, at that point in time, that is
 7         when -- what did -- did business grow after
 8         that, Dynotec's business?
 9   A.    It did grow.
10   Q.    Okay.  And with respect to the growth of the
11         business, did Dynotec -- do you know or do
12         not know about whether Dynotec was paying
13         COD after the execution of this credit
14         application?
15   A.    I don't know.
16   Q.    You don't know.  Okay.
17                    So let me ask you:  I saw -- in
18         your document production, I saw that you had
19         included some voice recordings.
20                    Do you recall those?
21   A.    Yes.
22   Q.    Some phone recordings, right?
23   A.    Yes.
24   Q.    Are those the only phone recordings or
25         recordings that you have -- you being
```



Page 39

```
 1           Dynotec has with respect to Transtar?
 2    A.     Yes.
 3    Q.     Okay.  Were other phone calls or meetings
 4           tape recorded?
 5    A.     No.
 6    Q.     No.  Okay.
 7                    Why were these two tape recorded?
 8    A.     We were trying to get the converter warranty
 9           problems settled.  They had gone on for
10           years without resolution and we wanted to
11           try and get some kind of resolution taken
12           care of on those and we were not getting
13           anywhere.  We were getting -- we were
14           getting shuffled around.
15    Q.     Did you let Transtar know -- Transtar
16           employees know that you were tape recording
17           these phone calls?
18    A.     I did not.
19    Q.     Why not?
20    A.     Because I wanted to, and I let myself know
21           that I was going to and okayed it.
22    Q.     I don't understand.  What -- explain that to
23           me.
24    A.     I wanted the phone calls recorded so that I
25           knew what was said in regards to the
```


MAGNA
LEGAL SERVICES

Page 40

```
 1          converter warranty problems.
 2   Q.    My question is -- my question was:  Why
 3          didn't you let the Transtar employees know
 4          that you were tape recording the calls?
 5   A.    I didn't, because I wanted truthful answers.
 6   Q.    Wanted truthful answers.  Okay.
 7                    And these calls, it looks to
 8          me -- and I don't see the exact dates on
 9          them.  But they look like they were done in
10          2018.
11                    Is that a fair statement?
12   A.    Yes.
13   Q.    Okay.  And at that time, I think from the
14          substance -- but let's just talk about what
15          was going.
16                    In 2018, Mr. DeMille -- do you
17          know Tom DeMille?
18   A.    Yes.
19   Q.    D-E-M-I-L-L-E.
20                    So Mr. DeMille approached Dynotec
21          about what Transtar believed amounts were
22          owed to Transtar, right?
23   A.    I'm sorry.  Can you say that one more time?
24   Q.    In 2018, is it a fair statement that
25          Mr. DeMille, on behalf of Transtar,
```



Page 41

```
 1        approached Dynotec about amounts that

 2        Transtar believed were owed to Transtar?

 3   A.   Yes.

 4   Q.   And I think at the time there was two

 5        buckets, one of products purchased from

 6        Transtar, and two, core charges that were

 7        not returned.

 8             Is that a fair statement?

 9   A.   Yes.

10   Q.   Okay.  And on the voice recordings, I was

11        surprised to hear that -- like on the core

12        charges, it sounded as if -- it didn't

13        sound -- your wife was admitting that there

14        were valid core charges that were submitted

15        and that she was not giving Transtar credit

16        for those, right?

17             MR. KAMPMAN:  Objection.

18             Go ahead, Tim.

19             THE WITNESS:  Yes.  She had

20        produced the credits but had not sent them

21        over to Transtar yet.

22   BY MR. CAMPBELL:

23   Q.   Do you think that is appropriate?

24   A.   At the moment, yes, it was.

25   Q.   It was.
```



Page 42

```
 1                    Did she ever send the credits
 2       out?
 3   A.  I don't know.
 4   Q.  Okay.  It sounded like she was really in
 5       charge of whether those credits would be
 6       granted or not.
 7                    I mean, is this a fair statement,
 8       at least in 2018?
 9                    MR. KAMPMAN:  Objection.
10                    Go ahead, Tim.
11                    THE WITNESS:  Yes, she was.
12       BY MR. CAMPBELL:
13   Q.  And that she was making the determination
14       whether the core would be credited in full
15       or partial or not, right?
16                    MR. KAMPMAN:  Objection.
17                    Go ahead, Tim.
18                    THE WITNESS:  She was making the
19       final determination.
20       BY MR. CAMPBELL:
21   Q.  The final determination.  Okay.
22                    And as to that, what was the -- I
23       mean, from my understanding, the total core
24       charges at issue were in excess of $200,000.
25                    Is that a fair statement?
```



Page 43

```
 1   A.   From the call, yes, at that time.  That's
 2        what I remember.
 3   Q.   And then the amount at issue for the
 4        purchases of Transtar products was a little
 5        over $700,000 at the time?
 6   A.   On the call, yes, I think that's what we
 7        discussed.
 8   Q.   And at that time, did Mr. DeMille
 9        ultimately, after those two phone calls --
10        and there were other meetings as well,
11        right?
12   A.   Yes.
13   Q.   I think you guys referenced a barbecue -- a
14        meeting at a barbecue restaurant?
15   A.   That was in my conference room prior to that
16        phone call.
17   Q.   You guys brought barbecue in and had a lunch
18        meeting?
19   A.   Yes.
20   Q.   And then you had another phone call as well?
21   A.   There was two phone calls total.
22   Q.   Two phone calls.  Okay.
23   A.   That were recorded.
24   Q.   Okay.  Well, I'm asking you, total in 2018
25        with respect to these amounts owed, you had
```



Page 44

```
 1        an in-person meeting, right?
 2   A.   Yes.
 3   Q.   Did you have any other in-person meetings
 4        other than the barbecue meeting?
 5   A.   Not that I recall.
 6   Q.   Okay.  And then how many phone calls -- I
 7        know you recorded two, but how many phone
 8        calls were there about these amounts owed in
 9        2018?
10   A.   I don't know.  It's hard to remember that
11        far back.
12   Q.   Do you think there were more than just the
13        two that you recorded?
14   A.   Yes.
15   Q.   Do you have any idea, was it two more, three
16        more?
17   A.   I don't.
18   Q.   Okay.  And do you recall that Mr. DeMille,
19        on behalf of Transtar, ultimately, I guess,
20        waived or forgave over -- a little over
21        $100,000 in core charges?
22   A.   I don't personally know that that was ever
23        properly credited, so I would say I don't --
24        I don't think so or I don't know that for
25        sure.
```



Page 45

```
 1   Q.   You don't know that for sure.

 2              Was that the verbal discussion,

 3        that Mr. DeMille would waive a certain

 4        amount of core charges in return for the

 5        parties moving forward and -- as business

 6        partners?

 7   A.   Yes.

 8   Q.   Okay.  Certainly, I would think that you and

 9        your wife would have double-checked whether

10        those core charges were actually waived by

11        Transtar, right?

12              MR. KAMPMAN:  Objection.

13              Go ahead, Tim.

14              THE WITNESS:  Yes, I would agree.

15        I don't know at the moment if they were ever

16        exactly applied correctly.

17   BY MR. CAMPBELL:

18   Q.   Okay.  But the parties at least -- was it

19        ever put if writing, this agreement, as to,

20        hey, Transtar will drop arguments as to a

21        100,000 or so in core charges in return for

22        the parties moving forward with these other

23        amounts owed and doing business together?

24              MR. KAMPMAN:  Objection.

25              Tim, go ahead.
```



Page 46

```
 1                    THE WITNESS:  No.
 2         BY MR. CAMPBELL:
 3    Q.   But at the time, that was -- was that the
 4         verbal agreement?  Was that the agreement
 5         that Dynotec and Transtar reached?
 6    A.   There was never a final agreement that we --
 7         that we were ready to, like, stamp.  There
 8         was no final agreement.
 9    Q.   Well, was the proposal from Mr. DeMille that
10         you guys were, I guess -- I mean, what were
11         you doing, considering it, or where did it
12         end?
13    A.   Yes.  Considering it, yes.
14    Q.   Did Mr. DeMille understand that he was
15         saying -- well, let me ask you this:  Was
16         Mr. DeMille clear that he would waive -- and
17         let's just say it's $100,000 in amounts
18         owed, in return for the other amounts owed,
19         being paid at some point in the future and
20         the two parties continuing to do business?
21                    MR. KAMPMAN:  Objection.
22                    Tim, go ahead.
23                    THE WITNESS:  Yes.
24         BY MR. CAMPBELL:
25    Q.   And did your ever tell Mr. DeMille that
```



Page 47

```
 1        Dynotec was not interested in that deal?
 2   A.   No.
 3   Q.   Okay.  And then you -- the parties did move
 4        forward after that -- those discussions, and
 5        you did continue to do business in 2018,
 6        2019, and most of 2020, right, or at least
 7        half of 2020?
 8   A.   Yes.
 9             THE TECHNICIAN:  Okay.  Let's
10        take a short break.  I need to look at my --
11        I haven't heard from the judge yet, so I
12        don't know if we'll hear anything on that.
13        Why don't we take about a 10-minute break.
14        Does that work for you guys?
15             MR. KAMPMAN:  It works for us.
16             MR. CAMPBELL:  Why don't we come
17        back at 10:15; is that okay?
18             MR. KAMPMAN:  Yes, 10:15 works.
19             (At this time a recess was held.)
20   BY MR. CAMPBELL:
21   Q.   Okay.  When we were ending at the break, I
22        was asking you about those 2018
23        negotiations.
24             Remember that discussion?
25   A.   Yes.
```



Page 48

```
 1   Q.   Let me ask you this:  Had the IRS given you
 2        and your wife notice of the tax dispute
 3        prior to those phone calls?
 4   A.   I don't remember.
 5   Q.   Well, let me ask you it this way:  When did
 6        you get the first notice?  Was it, like,
 7        a -- was it a letter?  Was it a lawsuit?
 8        How did you get the first notice?
 9   A.   Just a letter, if I remember right.
10   Q.   Okay.  And I guess, is it your recollection
11        that 2013 -- I mean, let me ask it this way:
12        In 2013, for example, did Dynotec pay some
13        of the federal income taxes or just none of
14        it on behalf of the employees?
15                  For example, if I just throw out
16        a number, say you owed 25,000, did Dynotec
17        pay 20 of it or none of it?
18                  MR. KAMPMAN:  Objection.
19                  Tim, go ahead.
20                  THE WITNESS:  I don't remember
21        exactly.  Yes, there was -- in 2013, there
22        was some tax payments.
23        BY MR. CAMPBELL:
24   Q.   There was.  Okay.
25                  Was that every year, or was it --
```



1      was it to the point when the tax payments

2      would not be made?

3   A.  I think after 2013 there wasn't any partial

4      payments made at that point.

5   Q.  So it's your recollection that -- well, let

6      me ask you this:  Was it being paid to the

7      state and local government or just -- just

8      not to the federal?  I mean, because you'd

9      have the income taxes or the withholdings

10      for presumably at least state and federal,

11      right?

12              MR. KAMPMAN:  Objection.

13              Go ahead, Tim.

14              THE WITNESS:  Yes.  I think in

15      2013 only partials to both and then neither

16      to both.

17   BY MR. CAMPBELL:

18   Q.  Okay.  And in Minnesota, is there local

19      income taxes or just state?

20   A.  Just state.

21   Q.  Okay.  So is there any state tax dispute for

22      income taxes owing?

23   A.  I do not believe so.

24   Q.  And then as to the federal, is it your

25      recollection, then, that 2013, 2014, '15,



Page 50

```
 1            '16, '17 -- that nobody raised an issue as
 2            to the failure to pay income taxes to the
 3            federal government and state government over
 4            all those years?
 5                       MR. KAMPMAN:  Objection.
 6                       Go ahead, Tim.
 7                       THE WITNESS:  What do you mean by
 8            "nobody"?
 9            BY MR. CAMPBELL:
10       Q.   Well, I guess I would say that -- I'm asking
11            you in 2018 if you were aware of the
12            dispute.  I guess, in 2018 -- let me ask it
13            this way:  In 2018, were you personally
14            aware -- prior to negotiating with
15            Mr. DeMille, were you personally aware that
16            the state and federal income taxes had not
17            been paid over those years, from 2013 to
18            2017?
19       A.   Yes.
20       Q.   Okay.  And with that -- and I guess, did --
21            why did you start making the payment in
22            2018?  Why did Dynotec start?
23       A.   We had finally financially recovered enough
24            to start making those payments as the
25            payroll, you know, ran each week, so...
```



Page 51

```
 1    Q.    Okay.  And has that continued through today?
 2    A.    Yes.
 3    Q.    Okay.  Was that through an agreement with
 4          the federal government, or was that just due
 5          to your finances?
 6                   MR. KAMPMAN:  Objection.
 7                   Tim, go ahead.
 8                   THE WITNESS:  I would say just
 9          finances, yes.
10    BY MR. CAMPBELL:
11    Q.    Okay.  And then -- so my question is just
12          simply:  You're personally aware of the, I
13          guess, amounts owed, but had you or Dynotec
14          been made aware through any of the taxing
15          authorities, prior to the discussions with
16          Mr. DeMille in 2018, that the federal
17          government was seeking the payment of those
18          income taxes that were not paid?
19    A.    Yes.  They, of course, were sending letters
20          for payment.
21    Q.    Okay.  And when did those start, 2013 or --
22          which year do you think they started?
23    A.    I don't know.
24    Q.    Was it for several years prior to 2018?
25    A.    I would assume, yes.
```



Page 52

1    Q.    Okay.  And I guess I -- we have the dispute

2          with Transtar, and I understand that you

3          disagree with the amounts.  But you have the

4          dispute with Transtar, you have the federal

5          government.  Was there any other amounts

6          owed from 2013 to 2017 that were in dispute

7          aside from the federal government, the state

8          government, and Transtar?

9    A.    No.

10   Q.    Okay.  So as to Transtar at the time in

11         2018 -- and again, I'm not asking you to

12         waive your arguments.  I just want to

13         verify.  At the time in 2018 when you were

14         having discussions with Mr. DeMille,

15         Mr. DeMille was saying there was two

16         buckets.  And on the purchases of Transtar

17         products, Mr. DeMille's position was that it

18         was a little in excess of $700,000 at that

19         time.

20                  Is that a fair statement?

21   A.    Yes.

22   Q.    And then as to the core charges that

23         Transtar believed they were owed, it was a

24         little over 200,000, or what would be that

25         amount?



Page 53

```
 1   A.   I don't remember from the call, but yes,
 2        somewhere in that range.
 3   Q.   Okay.  A little over 200,000?
 4   A.   Correct.
 5   Q.   Okay.  And you and your wife were asking --
 6        I think you asked for a little bit more than
 7        just 100,000 being waived, right?
 8             You asked for 100,000 being
 9        waived, and you asked for some current
10        months of core charges being waived as well?
11   A.   Yes.
12   Q.   Do you know how much you were asking for the
13        waiver from Transtar?
14   A.   I don't know.  They were talking months.  I
15        don't remember the dollar amounts.
16   Q.   Okay.  Did it end up that Mr. DeMille was
17        willing to waive approximately $100,000 in
18        core charges?
19   A.   I do not know that that was ever settled.
20   Q.   Okay.  Well, I'm not asking you -- I'm
21        asking you what he was proposing.
22   A.   That was in the argument, yes.
23   Q.   Okay.  And he was saying, I'll waive
24        $100,000 in core charges.  The remainder of
25        the core charges and product purchases would
```



Page 54

```
 1        be paid out over time was Mr. DeMille's
 2        position?
 3   A.   Yes.
 4   Q.   And that in return for that, the two parties
 5        would continue to do business together?
 6   A.   Yes.
 7   Q.   Okay.  Had the business actually stopped at
 8        that time, or was it ongoing and you were
 9        doing these discussions at the same time?
10   A.   I guess both.  Purchases were fairly normal,
11        but the purchases from Transtar to Dynotec
12        were very low to almost zero.
13   Q.   Meaning Dynotec at that time was not buying
14        new Transtar product?
15   A.   No.  That Transtar was not buying Dynotec
16        product at that point.
17   Q.   Okay.  So this was to open up saying, hey,
18        buy our products so we can be a supplier to
19        you?  You were trying to reach an agreement
20        on these amounts owed?
21   A.   Yes.
22   Q.   After this phone call -- after these -- I
23        guess you're saying that Mr. DeMille
24        presented the issue.  You don't know if it
25        was final.
```



Page 55

```
 1                      How did the phone calls end then?
 2          I mean, how did they end?  Did you guys work
 3          out a -- go and do business, or how did it
 4          end?
 5     A.   I mean, the one call ended that we were
 6          going to talk again, and I don't remember
 7          what the next call was or if there was a
 8          next call.
 9     Q.   Okay.  Did Mr. DeMille follow through and
10          start having Transtar purchase
11          remanufactured automatic transmissions again
12          from Dynotec?
13     A.   Yes.  At a very limited -- limited rate,
14          yes.
15     Q.   Okay.  And then the disputes -- you
16          mentioned in your discovery responses
17          receiving a letter from me in June of 2020,
18          right?
19     A.   Correct.  July, I think it was.
20     Q.   Did you and Mr. DeMille speak again about
21          the amounts that Transtar believed were owed
22          after the 2018 phone calls and prior to my
23          letter in 2020?
24     A.   I don't recall.
25     Q.   You don't recall.  Okay.
```



Page 56

```
 1                    Did your wife speak to Transtar
 2       or Mr. DeMille?
 3   A.  I don't know at this point without asking.
 4   Q.  Okay.  You would have to check with her?
 5   A.  Yup.
 6   Q.  Okay.  Okay.  So on those points -- and on
 7       the current --
 8                    MR. CAMPBELL:  Let's look at
 9       another exhibit.  Let's just go through --
10       Meagan, if we could put up Exhibit 2.
11                    (Lundquist Deposition Exhibit
12       Number 2 was marked for identification.)
13       BY MR. CAMPBELL:
14   Q.  Okay.  And did you have a chance -- did you
15       review Mr. DeMille's declaration that was
16       filed with the court?
17   A.  I guess I did.
18   Q.  Did you see this attachment to the
19       declaration?
20   A.  I did not actually.
21   Q.  You did not.  Okay.
22                    So let's go through a little of
23       this and just see.
24                    MR. CAMPBELL:  If we could --
25       just pull up that part that -- all that
```



Page 57

```
 1        writing there, Meagan, just so we can look
 2        through that.
 3        BY MR. CAMPBELL:
 4    Q.  So I just want to look at this one just to
 5        see, you know, the issue.  So first of all,
 6        it says, "Sales to partner as customer."
 7                 Do you see that yellow there, the
 8        top line?
 9    A.  Yes.
10    Q.  Okay.  So this one, Mr. DeMille's
11        declaration, is stating that this was for
12        Transtar products that were purchased by
13        Dynotec.
14    A.  Okay.
15    Q.  Okay.  And then the next line are -- the due
16        from Transtar were still amounts owed from
17        Transtar purchasing, I'm assuming,
18        remanufactured automatic transmissions from
19        Dynotec.
20                 Do you see that green number?
21    A.  Yes.
22    Q.  Do you disagree with that green number?
23    A.  I don't know.  I would have to verify it.
24    Q.  And then finally, we're looking at the
25        receipts of purchases from partner as
```



Page 58

```
 1          supplier due to Transtar in the -- I'll call
 2          it orange, the 324,891.27.
 3                    Do you see that?
 4     A.   I do.
 5     Q.   And that is for core charges not returned,
 6          at least in Transtar's view, right?
 7     A.   Correct.
 8     Q.   And then the final number is warranty labor,
 9          and what is that, the labor that Transtar --
10          is there a warranty on the products that
11          Dynotec sold to Transtar which was then sold
12          to a Transtar customer?
13     A.   Correct.
14     Q.   How does the warranty work on those
15          remanufactured automatic transmissions?  How
16          was it typically done?
17                    If you were to sell it to
18          Transtar and there was a warranty claim, how
19          does that work?
20     A.   Start to finish or crediting it?
21     Q.   Start to finish.  I mean, let's say that
22          Dynotec sold or remanufactured automatic
23          transmissions to Transtar in 2019.  Okay?
24     A.   Okay.
25     Q.   What type of warranty comes with that?
```



Page 59

```
 1   A.   18 months, 18,000 miles.
 2   Q.   Okay.  So Transtar then would sell to one of
 3        its customers that transmission, right?
 4   A.   Correct.
 5   Q.   And then that customer would give that same
 6        warranty and maybe in addition some of their
 7        own, but they would give that same warranty
 8        to the end user, right?
 9   A.   Yes.  Yes.  I mean -- and obviously, open to
10        whatever they sold as a warranty.
11   Q.   Okay.  And then if that end user, the car
12        owner, believed that they had transmission
13        issues within those 18 months, who did the
14        warranty work?
15             Was it like AMCO?
16             I mean, let's say that AMCO was
17        the end customer for this.  Would AMCO do
18        the warranty work for the customer?
19   A.   That was at Transtar's discretion.  We had
20        no control over who would do the work.
21   Q.   Okay.  And then how would it work?  Transtar
22        would then send an invoice, or what would
23        Transtar do if they believed there was
24        warranty work to complete?
25   A.   It depended on the situation.  If they had
```



Page 60

```
 1        another transmission from Dynotec in stock
 2        and they sent it, we would handle that
 3        warranty direct.  If they sent it from
 4        another vendor, then we would wait for it to
 5        be returned, do an inspection, and then
 6        whether or not we issued labor -- a warranty
 7        credit or not.
 8   Q.   Okay.  How did this number come about?
 9             What do you -- what is -- do you
10        have an understanding of what Transtar's
11        position is as to this number, the
12        27,831.81?
13   A.   Well, it would be for labor payments, but I
14        don't know what they were for right now
15        without verifying them.  It's just a number.
16   Q.   Did you and your wife verify any of these
17        numbers?
18   A.   We have not yet.
19   Q.   Now, as -- as to the parts purchased, the
20        728,465.65, Dynotec doesn't dispute that --
21        probably even more than that, but Dynotec
22        doesn't dispute that parts were purchased by
23        Transtar, right?
24   A.   No.
25   Q.   Okay.  Dynotec's issue is, what, you're
```



Page 61

```
 1            claiming that some or all of those parts
 2            were faulty?
 3    A.      I don't know about those parts listed in
 4            that dollar amount right now.  We, of
 5            course, had years of torque converter
 6            problems that we had been trying to address.
 7            So yes, there's a big number.  I just don't
 8            know that's it's in that number.
 9    Q.      Let me ask you, first of all, as to the core
10            credits, the $324,891.27.  What is Dynotec's
11            position on the core credit?
12    A.      I would have to review that with, you know,
13            the actual documentation, but I would assume
14            there's money due there.  I just -- I don't
15            know, you know, between whether it was
16            incorrect, you know, returns, not returned,
17            not our transmission.  The number would have
18            to be -- would have to be verified.
19    Q.      Well, would it not be the case that when the
20            cores were returned that Dynotec would give
21            written documentation to Transtar detailing
22            whether the cores were credited in whole or
23            in part?
24    A.      No.  The way I understand it is they would
25            put the credit on there regardless, and then
```



Page 62

1      we would have to go back and prove whether

2      or not it was credited or received.  They

3      put the number on there no matter what.

4   Q.  Okay.  But -- I mean, if Dynotec was

5      disputing the number -- I mean, we're now at

6      least six months later, and we're -- I mean,

7      these things weren't all -- didn't all occur

8      in June.  That credit, that's a lot of

9      transmissions purchased, right?

10  A.  Yes.

11  Q.  I mean, if the core charge is 324,000 -- in

12     excess of 324,000, the total purchases would

13     be well over a million dollars, right,

14     probably triple that?

15              MR. KAMPMAN:  Objection.

16              Go ahead, Tim.

17              THE WITNESS:  I would have to do

18     the math on that, but no, I don't think it

19     would being over a million.

20  BY MR. CAMPBELL:

21  Q.  You don't think the actual finished product

22     would be that much more than the core

23     charges?

24  A.  We would have to do some math in order for

25     me to agree to that.  I don't know



Page 63

```
 1              without -- without getting a calculator out.
 2    Q.   Let me just ask you in simple terms.  I
 3         mean, maybe as a dumb lawyer I don't
 4         understand the transmission business at all,
 5         but I would think that if I'm buying the
 6         finished product it would cost more than the
 7         core charge.
 8                   Is that not correct?
 9    A.   Not in every case.
10    Q.   Not in every case.
11    A.   No.
12    Q.   So the core charge might be in excess of the
13         actual finished product?
14    A.   It could be.
15    Q.   It could be.
16    A.   It could be.  Yup, absolutely it could be.
17         A critical core, depending on the
18         application, you know, I -- I bet there are
19         some that are equal, possibly some that are
20         more.
21    Q.   Okay.  Well, regardless of whether these
22         purchases were 300,000 or a million or
23         whatever amount it is, the actual purchase
24         of the finished products, does Dynotec not
25         give any documentation to Transtar to say,
```



Page 64

```
 1        hey, you have a credit; here you listed a
 2        credit of this core, and we're disputing it
 3        or we are returning this core?  Is there no
 4        documentation from Dynotec?
 5   A.   No.  I would say there's documentation.  It
 6        doesn't mean that they would process it --
 7        or if we denied it -- if we denied a labor
 8        claim, it doesn't mean that it was taken
 9        care of on Transtar's side.
10   Q.   Well, my question is:  When I look through
11        your documents, I don't see any documents
12        where Dynotec is disputing core charges and
13        informing -- informing Transtar that the
14        total of that amount is in dispute.
15   A.   Yeah.  I don't know what was submitted as
16        far as that goes from Brian.
17   Q.   From Brian.  Who is Brian?
18   A.   Brian Kampman.
19   Q.   Okay.  Well, I'm asking you just in terms of
20        ordinary business.  Do you know if Dynotec
21        advises, not just Transtar but its
22        customers, of, hey, we are disputing or --
23        some or all of the credit for a core?
24   A.   Yes.  They had been advised on many, many,
25        many line items.  I couldn't tell you.  I
```



Page 65

```
 1        don't handle it direct.  I just know that
 2        the disputes go unresolved.
 3   Q.   Is there writings of Dynotec's position?
 4   A.   I don't know at the moment.
 5   Q.   You don't know.  Okay.
 6                 So you don't know if in the
 7        ordinary course of business Dynotec gives
 8        out any type of written notification to
 9        customers that a core charge was rejected in
10        whole or in part?
11   A.   Yes.  Yes, we do.  Whether -- the credit
12        could be zero or it could be for the full
13        amount if a credit is issued.  It's whether
14        or not it was ever credited, subtracted,
15        whatever on Transtar's side.
16   Q.   Okay.  But here's -- I'm -- and maybe I'm
17        not explaining myself.  Real simple.  Okay.
18                 Transtar is putting this core
19        charge down.  When they return it, they put
20        it in their documentation saying they're
21        owed a certain amount of core charge, right?
22   A.   Yes.
23   Q.   And my question to you is:  In response to
24        that, is Dynotec giving any written
25        statement --
```



Page 66

1              MR. CAMPBELL:  And I think the

2      court's calling.  Just one second.  Let me

3      take this.  I'll put it on mute for just a

4      second.

5              (Whereupon, a call from the Court

6      was had.)

7              MR. CAMPBELL:  The magistrate

8      judge is going to take a call -- we don't

9      need to do it on the record.  Why don't we

10     take a break right now.  I'm going to get an

11     e-mail, or all of us will get an e-mail with

12     the call-in info.  We'll all call in to the

13     magistrate judge, raise as our issue as to

14     the tax issues and personal liability, and

15     then we'll come back in.

16              Laurie, I think we'll probably

17     be -- it shouldn't be long.  I would assume

18     we're going to be 5 or 10 minutes, so we'll

19     be back.

20              (At this time a recess was held.)

21              MR. CAMPBELL:  During break,

22     counsel spoke to the magistrate judge and

23     we've reached an agreement that we're not

24     going to go further into the personal IRS

25     criminal or civil liabilities as to



Page 67

1       Mr. Lundquist, but we're not waiving those

2       rights.  We can go into those post

3       deposition.

4                   And, Brian, you agree that,

5       subject to some protective orders, you're

6       going to look into the amount or amounts

7       that Mr. Lundquist may be personally

8       responsible for for Dynotec's amounts owed

9       and penalties or whatever is owed to the

10      IRS.

11                  Is that a fair statement?

12                  MR. KAMPMAN:  That is a fair

13      statement.

14                  MR. CAMPBELL:  So we'll close

15      today at some point and that issue will

16      remain out there and we'll work together to

17      try to get that.

18                  So if there's nothing else, we'll

19      go back.

20      BY MR. CAMPBELL:

21  Q.  Mr. Lundquist, are you set to go, or do you

22      need a break or anything?

23  A.  I'm good.

24  Q.  We'll take a break here momentarily.

25                  Let's talk -- let me just ask



Page 68

1     you, Mr. Lundquist:  Have you ever

2     personally filed bankruptcy?

3   A.   I have.

4   Q.   You have.

5              When was that?

6   A.   I don't recall the exact year.  I think it

7     was around 2000.

8   Q.   2000.  Okay.

9   A.   Yeah.

10  Q.   Has Dynotec ever filed for bankruptcy?

11  A.   No.

12  Q.   Okay.  And are you the sole owner of

13    Dynotec?

14  A.   Yes.

15  Q.   Okay.  Okay.

16              MR. CAMPBELL:  So let's go back

17    to that exhibit we were looking at,

18    Exhibit 2.

19              Thanks, Meagan.

20  BY MR. CAMPBELL:

21  Q.   So when we broke, I was asking you about the

22    core charges, the $324,891.27.

23              And just so the record is clear,

24    those core charges you -- you dispute the

25    amount.  I'm not asking you to waive any of



Page 69

1      that, your arguments.

2              But you don't dispute that

3      Transtar has given notice to Dynotec that it

4      believes these core charges are owed too?

5   A.  Yes.

6   Q.  Okay.  And then as to documentation back to

7      Transtar, you don't know if Dynotec gives

8      any type of documentation to Transtar or

9      other customers as to individual core

10      charges that are disputed?

11  A.  We do give documentation back that would say

12      whether it was a zero or a partial or

13      whatever the situation was.

14  Q.  Okay.  And so you do believe Dynotec has

15      that for all or some of this 324,891.27?

16  A.  Yes.

17  Q.  And could you make certain that Mr. Kampman

18      gets those documents so we can see those?

19  A.  Yes.

20  Q.  Okay.  And then as to that, is the core

21      returned to Transtar if it was rejected on

22      whole or in part?

23  A.  I don't know that process.  I would have to

24      find out.

25  Q.  You would have to find out.  Okay.



Page 70

```
 1   A.   Yeah.

 2   Q.   With that -- is that a -- I guess let me ask

 3        you about in terms of the amount.

 4                   Is that a surprisingly high

 5        amount for a customer to have core charges

 6        that are rejected?

 7   A.   You know, I don't know, because, you know,

 8        we went on so long while Transtar was in

 9        bankruptcy that, you know, any of these

10        numbers really need to be verified on both

11        sides.  You know, they drew a line in the

12        sand and that's the number they have and

13        they need to be verified.

14   Q.   My question is:  I mean, you understand that

15        Transtar employees were not likely the ones

16        who were putting in the remanufactured

17        transmissions into the customer's car,

18        right?

19   A.   Correct.

20   Q.   They were selling -- Transtar was selling

21        Dynotec's products to -- via AMCO or some

22        other Transtar customer, right?

23   A.   Yes.

24   Q.   And then that Transtar customer would return

25        the core to Transtar, right?
```



Page 71

```
 1   A.   Yes.

 2   Q.   And then Transtar would return it to

 3        Dynotec?

 4   A.   In theory.

 5   Q.   In theory.  Okay.

 6             Is it your position that the core

 7        was not returned, or is it your position

 8        that the core was returned and it was

 9        damaged or some other issue?

10   A.   Both.  They were taking credits for cores

11        that were not returned.

12   Q.   Okay.  But you don't have that record today?

13   A.   I don't have it today.

14   Q.   Are you and your wife in the process of

15        reviewing the core charges?

16   A.   Yes.

17   Q.   And when do we expect to get that core

18        charge response?

19   A.   I don't know, but I can find out.

20   Q.   Okay.  Okay.  Now as to the purchases, let's

21        talk about the other big number, the

22        $728,465.65.  Now -- and I think we already

23        talked about it.

24             Dynotec doesn't dispute that that

25        amount or more -- probably more because some
```



Page 72

```
 1        was paid, right, of -- Transtar purchases
 2        were made from Transtar by Dynotec, right?
 3   A.   On the 728,000 number?
 4   Q.   Yes.
 5   A.   Okay.  I just think you said it backwards is
 6        all, so...
 7   Q.   Those are purchases from Dynotec -- Dynotec
 8        making purchases from Transtar, right?
 9   A.   Correct.
10   Q.   Okay.  Does Dynotec dispute that that
11        amount, at least of the purchase amount, is
12        accurate?
13                  MR. KAMPMAN:  Objection.
14                  Go ahead, Tim.
15                  THE WITNESS:  Yes, I would
16        dispute that amount.
17   BY MR. CAMPBELL:
18   Q.   You would dispute that amount.
19                  Do you have that accounting of
20        your dispute done yet?
21   A.   I do not.
22   Q.   You do not.
23                  And what are you doing to dispute
24        that total purchase amount?
25   A.   Each line item needs to be reviewed, but I
```



Page 73

```
 1           don't think that we have the most current --
 2           or we did not have the most current ledger
 3           until you had sent that over.  Our ledger
 4           was old from Transtar.
 5      Q.   Well, you've had the ledger since July of
 6           2020, right?
 7      A.   That, I don't know.  I didn't -- I didn't
 8           think so.
 9      Q.   So you're saying Dynotec is reviewing the
10           ledger to determine whether the $728,465.65
11           is accurate?
12      A.   Correct.
13      Q.   Okay.  Now, on this offset, what is Dynotec
14           alleging as to this offset?
15      A.   This is failed torque converters that we
16           purchased from Transtar that failed after
17           installation causing severe damage to the
18           transmission, causing it in need of either
19           replacement or to be overhauled again.
20      Q.   Okay.  And did you give documentation of the
21           failure and the alleged warranty work or
22           work that Dynotec performed?
23      A.   Multiple times, yes.
24      Q.   I'm not talking about a verbal claim.
25                     Is there documentation -- just
```



Page 74

```
 1          like the warranty labor, when we look at
 2          that 27,000, Transtar is sending
 3          documentation to Dynotec informing Dynotec
 4          of warranty labor being performed, right?
 5   A.     Yes.
 6   Q.     Did Dynotec send documentation to Transtar,
 7          in the ordinary course of business, advising
 8          Transtar of torque converter X failed,
 9          here's our work, here's the documentation to
10          confirm the work?
11   A.     It was not an ongoing -- that we were
12          sending invoices.  When we were trying to
13          get resolution to the problems, we had sent
14          groups of invoices for them to look at.  You
15          know, multiple people were involved, and we
16          went into years of runaround.
17   Q.     Well, whether -- you're talking about
18          negotiations.
19                  Mr. Lundquist, if you are getting
20          a product -- and "you" being Dynotec -- and
21          that product Dynotec believes failed or that
22          there was a warranty coverage, is there not
23          some documentation that you provide to --
24          whether it's Transtar or any other
25          manufacturer or seller of the fact that,
```



Page 75

```
 1          hey, your product failed and here's the work
 2          that we performed and you owe us X amount?
 3     A.   It was not given on a daily, weekly basis.
 4          It was -- it was accruing.
 5     Q.   Was it given at all during the course this
 6          relationship?
 7     A.   In small amounts, yes.  The big number was
 8          brought up when Tom DeMille came back to
 9          Transtar.
10     Q.   Okay.  And I understand making an argument
11          that there were torque converters that
12          failed.  But you do understand that if the
13          warranty labor -- if Transtar put warranty
14          labor here of a million dollars instead of
15          27,000, would you not say to Transtar, I
16          want to see the documentation of this
17          alleged million dollars of warranty labor?
18     A.   Yes.
19               MR. KAMPMAN:  Objection.
20               Go ahead, Tim.
21               THE WITNESS:  Yes.
22     BY MR. CAMPBELL:
23     Q.   And you're not just going to take Transtar's
24          word for it, right?
25     A.   Yes.  You know, I -- yes.
```



Page 76

```
 1   Q.   And so why wasn't Dynotec sending written
 2        documentation of the alleged torque
 3        converter issues, and more importantly the
 4        work that was being performed for those
 5        customers in order to correct the torque
 6        converter issues?
 7   A.   I don't know that they knew what to do with
 8        it.  Anybody that I was in contact did not
 9        know what to do with them, so we just kept
10        accruing them and -- and keeping track of
11        them.
12   Q.   "We" being Dynotec?
13   A.   "We" being Dynotec, yes.
14   Q.   And did Dynotec actually keep documents
15        showing the alleged product that was
16        purchased with an invoice that showed, first
17        of all, that the torque converter or some
18        other product was faulty?
19   A.   Yes.
20   Q.   Was that produced or no?
21   A.   Yes.
22   Q.   Okay.  And then does Dynotec have actual
23        documentation showing the alleged warranty
24        work or replacement costs that were for that
25        product?
```



Page 77

```
 1   A.   Yes.

 2   Q.   It does.  Okay.

 3             But that was not provided to

 4        Transtar during the course of the business

 5        relationship?

 6   A.   Like I said, in small amounts, but there was

 7        never -- there was never any traction.  It

 8        was handed off to them, and nothing was done

 9        with it.

10   Q.   Okay.  When you say "small amounts," you're

11        claiming that the amounts are in excess of a

12        million dollars now, right?

13   A.   Yes.

14   Q.   Okay.  What small amount was documented to

15        Transtar during the ordinary course of

16        business?

17   A.   I don't know the exact number, but early on

18        when the problems started, we had brought

19        invoices to Rick Wilemon from Transtar, and

20        there was about $70,000 worth of claims on

21        there that was handed off to him.

22   Q.   Okay.

23   A.   And Rick sent it off to the group --

24        whatever that group was in Transtar, and

25        never heard a word.
```



Page 78

```
 1   Q.   What year was that?
 2   A.   I think that was 2015.  I think it was our
 3        first trip down to the torque converter
 4        plant in Tennessee.
 5   Q.   Okay.  2015 is when you handed that off you
 6        said?
 7   A.   Yeah.
 8   Q.   And did Transtar give a credit of $70,000?
 9   A.   No.
10   Q.   It did not.  Okay.
11                 And did you hand off any other
12        documentation of the alleged defective
13        product after that 2015 documentation?
14   A.   I would say no.  I tried to give copies to
15        Tom DeMille in 2018 when he was here in my
16        conference room, and he was not interested
17        in taking it.
18   Q.   And what was that paperwork that you were
19        trying to hand off to him?
20   A.   I was trying to show him the failure reports
21        from Transtar, the invoices that we had
22        accrued for labor payments to our customers,
23        parts costs, et cetera.
24   Q.   Okay.  Well, you've handed off, you claim,
25        about $70,000 in documentation that you
```



Page 79

```
1              claim support the defective product, right?
2    A.    Early on, yes.
3    Q.    Okay.  Do you think that it's -- is it your
4              normal business practice to then claim that
5              there's more than 900,000 more of that
6              documentation that you don't give over the
7              next six years of the business relationship?
8                          MR. KAMPMAN:  Objection.
9                          Go ahead, Tim.
10                         THE WITNESS:  There was -- there
11             was so many phone calls.  There were so many
12             people at Transtar trying to solve it,
13             trying to get resolution, trying to figure
14             out what to do.  Years went by.  Then the
15             bankruptcy started, and during the
16             bankruptcy, there was little to no
17             communication.
18   BY MR. CAMPBELL:
19   Q.    Okay.  Well, my question is:  On your
20             documentation, certainly no different than
21             this warranty labor as to a certain product
22             that Transtar is claiming, is it not
23             something that Dynotec would lay out in
24             writing to a customer or to a supplier that,
25             here's the product that was purchased,
```



Page 80

```
 1         here's what happened, and here's the cost
 2         that we incurred in order to repair the
 3         issue?
 4    A.   That's what I tried to do in early '18 with
 5         Tom DeMille.
 6    Q.   Okay.  So you're claiming -- well, why not
 7         just send it out to Transtar if you claim
 8         that you have this documentation?
 9              I mean, if you're disputing this
10         amount or if you're claiming warranty work,
11         why would you not send that out with a
12         claim?
13    A.   Yeah.  Who was I suppose to send it to?
14    Q.   I would think that you would send it to your
15         supplier, you would send a letter.
16              Now as to it, what was the
17         warranty on the torque converter that is at
18         issue?
19    A.   What do you mean?
20    Q.   What was the warranty?  What did it cover?
21              You said -- for example, you gave
22         me your warranty.  What is the warranty on
23         the torque converter?
24    A.   You know, it had changed over time with
25         Transtar, but I think at the time that the
```



Page 81

```
 1          problem started it was three year unlimited
 2          miles.
 3    Q.    Okay.  And it was a replacement of that
 4          torque converter, correct?
 5    A.    Yes, according to their -- according to
 6          their warranty.
 7    Q.    Yes.
 8                   And you're here saying that you
 9          should get warranty labor, I guess, right?
10                   You're claiming that your
11          employees did a certain amount of work and
12          that you should get paid for that?
13    A.    Correct.
14    Q.    Okay.  And you never gave documentation.  I
15          understand that you claim -- when you were
16          handing it off to Mr. DeMille, were you
17          giving actual documentation of each part
18          that was allegedly defaulted and how many
19          man hours were put into each of those parts?
20    A.    Yes.  I was going to give him the whole
21          entire stack, but he did not want it.
22    Q.    Presumably you've gave that whole entire
23          stack to Mr. Kampman, and it's been provided
24          to us.
25    A.    Yes.
```



Page 82

```
 1    Q.    So -- and that shows the specific labor work
 2          for each of the products?
 3    A.    Correct.
 4    Q.    What right does Dynotec believe -- where
 5          does the right come from that Transtar
 6          somehow owes for labor costs?
 7    A.    Above normal circumstances and admissions
 8          from Transtar employees, that they were
 9          going to take care of more than the torque
10          converter.
11    Q.    And when was the last claim of this that you
12          claim?
13                    When was the last time you heard
14          somebody make that -- I guess what you would
15          frame as a promise?
16    A.    I would say in 2018.
17    Q.    And who allegedly made that?
18    A.    I would say it had to have been Scott
19          Hopkins front Transtar.  It had to be Corby
20          Wilemon.  I don't think Tom DeMille made any
21          promises after that meeting.
22    Q.    Would you not -- if those promise were made,
23          would it not seem to make sense that you
24          would send a letter saying that, per your
25          promise, here are the parts at issue, and
```



Page 83

1        here's a labor cost for each of those parts?

2                    MR. KAMPMAN:  Objection.

3                    Go ahead.

4                    THE WITNESS:  Yes.  Looking back,

5        yes, it should have been sent.

6        BY MR. CAMPBELL:

7    Q.  Do you think it's fair to now come into a

8        courtroom and to gather documentation

9        allegedly claim that the $728,465.65 in

10       parts -- I guess what portion of that are

11       you claiming is faulty, all or some?

12                   MR. KAMPMAN:  Objection.

13                   Go ahead, Tim.

14                   THE WITNESS:  I would say some to

15       all, yes.

16       BY MR. CAMPBELL:

17   Q.  Some to all.

18                   So I guess I would have to

19       question, if all of the product was faulty,

20       why was Dynotec continuing to buy the

21       product?

22   A.  Well, we -- unfortunately, I have to tell

23       you that we were being told that we were

24       going to be taken care of and they would

25       help us out and they would get through it.



Page 84

```
 1          So I believed what they were saying, and I
 2          continued to purchase from them.
 3     Q.   Could it be that no other supplier would
 4          give you this line of credit to run up
 5          700,000 in excess parts without paying?
 6                    MR. KAMPMAN:  Objection.
 7                    Go ahead, Tim.
 8                    THE WITNESS:  I don't know that.
 9          I never asked anybody else to do that.
10     BY MR. CAMPBELL:
11     Q.   Now, similar to not paying the federal
12          government, was Dynotec looking at these
13          amounts owed to Transtar and just simply
14          saying, financially, we can't pay this?
15                    MR. KAMPMAN:  Objection.
16                    Go ahead, Tim.
17                    THE WITNESS:  You know, it
18          occurred over time, so -- you know, there
19          was payments being made, I mean, along the
20          way.  So I -- it was never about not paying
21          Transtar, no.
22     BY MR. CAMPBELL:
23     Q.   I guess I would say, if there's 324,000 in
24          core charges -- and I understand that you
25          don't necessarily know if that's the -- I
```



Page 85

```
 1        guess you do know.  That 324 is an amount on
 2        those core charges that Transtar has given
 3        you in writing as to the amounts that they
 4        believe is owed to Transtar on core charges,
 5        right?
 6   A.   Correct.
 7   Q.   Has that amount been paid to the federal
 8        government for the income taxes?
 9                  Where has the money gone?
10                  MR. KAMPMAN:  Objection.
11                  Go ahead, Tim.
12                  THE WITNESS:  It has not been
13        paid.
14   BY MR. CAMPBELL:
15   Q.   It has not been.
16                  Where's that money gone?
17                  I mean, where's -- if we're
18        looking at this in excess of a million,
19        you're saying that, what, you paid employees
20        to do warranty work?  Is that your
21        allegation?
22                  MR. KAMPMAN:  Objection.
23                  Go ahead, Tim.
24                  THE WITNESS:  Yeah.  Just
25        operating, you know, payroll expenses, you
```



Page 86

```
 1        know, the normal course of business.
 2                  MR. CAMPBELL:  Okay.  Let's take
 3        a break.  I don't think we'll be that much
 4        longer.  Why don't we take a break until
 5        11:30 eastern.  Okay?
 6                  MR. KAMPMAN:  Thanks, Dave.
 7                  (At this time a recess was held.)
 8   BY MR. CAMPBELL:
 9   Q.   Mr. Lundquist, I just want to ask you a
10        follow-up to some of the points.  Those
11        verbal claims on the warranty work for the
12        torque converters, who did you say made the
13        verbal claims?
14                  I guess, who are you claiming --
15        who did -- I mean, you said Tom did not, but
16        who made the verbal claims?
17   A.   My recollection, I mean, it was all the way
18        up the chain, but Don Robinson, Jim Deal or
19        James Deal, Scott Hopkins, Corby Wilemon,
20        Rick Wilemon, Ed Orzetti.  I think that's
21        it.
22   Q.   Okay.  And what did they allegedly say?
23   A.   Well, we never got to a point of resolution,
24        but they -- they -- they knew it was a
25        problem.  They said to keep track of it and
```



Page 87

```
 1        we'll try and figure it out.
 2   Q.   Okay.  So keep track of it, try to figure it
 3        out is as much as they said?
 4   A.   Yeah.  Obviously, there was more to the
 5        conversations, but, you know, they knew it
 6        was going on.  They knew that they had to do
 7        something.  We just didn't ever come to that
 8        point where we got that agreement.
 9   Q.   When is the last discussion you had with any
10        of those gentlemen as to the torque
11        converters?
12   A.   We started building our own torque
13        converters -- 2018, I think it was.  So -- I
14        mean, I would say in 2017 is, you know,
15        the -- they were just sitting there as
16        problems, and we weren't purchasing them any
17        more, so...
18   Q.   Okay.  And then Mr. DeMille in 2018, when he
19        was reviewing the amounts owed, did not make
20        any of those statements to you?
21   A.   No.
22   Q.   Okay.  Okay.  And now let me ask you:  Prior
23        to -- let's say in 2016, who were -- who was
24        Dynotec's largest customers?  Give me your
25        top three in, like, 2016.
```



Page 88

 1   A.   Besides Transtar, I could not answer that
 2        right now.
 3   Q.   You couldn't tell me who would be the
 4        largest repeat customers?
 5   A.   The only one would be Transtar.  Transtar
 6        was our biggest customer at that point.
 7   Q.   Well, you can't give me any of the other
 8        entities that purchased your products?
 9   A.   Not without looking at numbers to tell you.
10        We have thousands of customers.  It's hard
11        to remember that.
12   Q.   Okay.  And so -- I guess when I follow-up
13        with your counsel, we will be able to
14        determine -- do you have customers that --
15        and I'm looking at 2016, because I want to
16        take some depositions of them to see what
17        they say about the products.
18             So in 2016, aside from Transtar,
19        did you have -- was there other entities
20        that purchased multiple remanufactured
21        automatic transmissions on a monthly basis?
22   A.   I don't remember.
23   Q.   You don't remember.
24             You can't tell me enough about
25        your customer base that -- I mean, is it all



Page 89

```
 1          one-offs, or is there customers that call

 2          you weekly or on a regular basis to get

 3          their remanufactured transmissions?

 4    A.    So back then, it was -- one-offs was the

 5          majority of our business.  You know, today

 6          we have more customers that purchased

 7          multiples, but back then it was one-offs,

 8          so...

 9    Q.    Okay.  Well, let me ask you this:  As to the

10          purchase of your remanufactured

11          transmissions, okay -- and this is 2016 --

12          when you say Transtar was your biggest

13          customer, how big was Transtar, what

14          percentage of your business?

15    A.    I don't know.  If I put a number out, it's

16          only a guess.

17    Q.    Okay.  Well, give me your best guess.

18    A.    30 percent.

19    Q.    Okay.  And we see that the -- with just the

20          core charge, I mean, it has to be a decent

21          amount of purchases, right?

22    A.    Right.

23    Q.    Okay.  So with that -- so I guess I would --

24          I would ask this:  So Transtar should have a

25          pretty good understanding of how many of the
```



Page 90

```
 1          remanufactured transmissions that they sent

 2          out that ended up having problems with

 3          customers, right?

 4    A.    I would assume they would have tracking for

 5          that, yes.

 6    Q.    Okay.  So Transtar could look at their

 7          purchases from Dynotec and could tell us.

 8                   And I take it -- are you claiming

 9          that -- if Transtar was your biggest

10          customer over these years, are you claiming

11          that your warranty work was on the Transtar

12          sales, or who was it on?

13    A.    Both.

14    Q.    Both.  Okay.

15                   So you're saying that Transtar

16          would send them back to your business and

17          your business was doing the warranty work

18          and then you're claiming that as an amount

19          owed by Transtar to you?

20    A.    On some of the invoices, yes.

21    Q.    So Transtar would certainly have a record if

22          their purchases of your remanufactured

23          transmissions were faulty or not, right?

24    A.    Yes.

25    Q.    They would know what was the cause,
```



Page 91

```
 1        presumably, or at least what was reported by
 2        the installer of that transmission?
 3  A.    Yes.
 4  Q.    Okay.  Okay.  So let me -- let me just ask
 5        you about, you know, some of these -- some
 6        other documents here just -- and I just want
 7        to understand a couple things just so I can
 8        understand.
 9                  So are you denying that Dynotec
10        had a line of credit with Transtar?
11  A.    I would consider it an open account.  That's
12        kind of the way the industry views it.
13  Q.    Would you not say an open account is that
14        they are letting you have a line of credit,
15        that you're not required to pay charge on
16        delivery?
17                  MR. KAMPMAN:  Objection.
18                  Go ahead, Tim.
19                  THE WITNESS:  There was no credit
20        max/min terms.  There was no terms to it.
21        To me, it was an open account.
22        BY MR. CAMPBELL:
23  Q.    The open account meant that you didn't have
24        to pay everything upon receipt of the
25        product, right?
```



Page 92

1                   You don't think there was any

2        credit given to you?

3    A.   Well, yes, I guess it would be credit, but I

4        viewed it as an open account.  They didn't

5        call up and say, you know, you've got

6        $10,000 you can spend up to.  It was an open

7        account.

8    Q.   Okay.  Well, I guess they probably should

9        have, right?

10                  I guess that's shame on Transtar

11       for letting that open account get so high,

12       right?

13                  MR. KAMPMAN:  Objection.

14                  Go ahead, Tim.

15                  THE WITNESS:  Yes.

16   BY MR. CAMPBELL:

17   Q.   Okay.  As to -- and you're denying that the

18       document that we reviewed is a credit

19       application?

20   A.   Yes.  To me, it's an account -- open account

21       application.

22   Q.   It is checked off as a credit application,

23       right?

24   A.   Yup.

25   Q.   But you're denying that it is?



Page 93

```
 1   A.   It's checked off as, yes.
 2   Q.   You're denying that you personally
 3        guaranteed the amounts owed by Dynotec?
 4   A.   No.
 5   Q.   You're not.  Okay.
 6                 And you're denying that
 7        Dynotec -- you know, regardless of what you
 8        call it, was given credit with Transtar,
 9        right?
10   A.   Yes.
11   Q.   When is the last time -- I guess, let me ask
12        you:  When is the last time Dynotec actually
13        made a payment to Transtar?
14   A.   I don't know the exact date.  It was in
15        2020.
16   Q.   Okay.  And then as to the -- was there
17        purchases of Transtar products after 2017?
18   A.   After 2017?
19   Q.   Yes.
20   A.   Yes.
21                 MR. CAMPBELL:  Okay.  And then
22        let's take a short break.  I think we're
23        about wrapped up.  I want to touch base with
24        my colleague.  Just give us five minutes,
25        guys, and then we'll be back on.
```



Page 94

1              MR. KAMPMAN:  Sounds good.

2              (At this time a recess was held.)

3              MR. CAMPBELL:  We'll order just

4        so -- with that, I'm sure they'll probably

5        read, but we'll order it, just so you know.

6              MR. KAMPMAN:  We're going to

7        read.

8              THE COURT REPORTER:  What kind of

9        transcript would you like, Mr. Campbell?

10             MR. CAMPBELL:  Whatever your

11       normal is fine.  I like it electronically,

12       but whatever your normal format is fine.

13             THE COURT REPORTER:  And

14       Mr. Kampman?

15             KAMPMAN:  That is fine too.

16       Electronic, as long as it's electronic with

17       normal formatting it is fine.

18       BY MR. CAMPBELL:

19    Q.   Mr. Lundquist, I just want to ask you just

20         some final questions.  On the documentation

21         production that was given, did you review

22         the documents or no?

23    A.   I did not.  I was just helping put them

24         together in order.

25    Q.   So you can't tell me what was produced and



Page 95

```
 1        what was not?
 2   A.   Not without reviewing it now that it's been
 3        put together.
 4   Q.   Okay.
 5                MR. CAMPBELL:  Well, subject to
 6        the discussion and agreement we had about
 7        your personal tax liability and the
 8        investigation into that, then we'll keep
 9        open.  We can close here for today.
10                Brian, we had an agreement with
11        all of that?
12                MR. KAMPMAN:  That's fine.
13                MR. CAMPBELL:  And we've already
14        said, Tim, that you will read.
15                Right, Brian.
16                MR. KAMPMAN:  Yes.  We're going
17        to read.
18           (Concluded at 10:44 a.m. Central)
19
20
21
22
23
24
25
```



Page 96

```
 1               S I G N A T U R E   P A G E
 2
 3     CASE:  Transtar Industries, LLC vs. Tim
       Lundquist, et al.
 4
       DATE OF DEPOSITION:  March 17, 2021
 5
                 I, TIM LUNDQUIST, deponent,
 6     certify that I have read the foregoing
       transcript of my testimony and have made the
 7     following corrections and/or changes and the
       reason why:
 8
       PAGE:  LINE:  CHANGE:
 9
10
11
12
13
14
15
16
17
                  _____
18                     TIM LUNDQUIST
19
       _____   _____
20       AFFIX SEAL                   NOTARY PUBLIC
21                       Dated this _____ day
       of_____,20_____.
22
23     Please return to:
24     Laurie A. Kjelden
       5 Hawthorne Court
25     North Oaks, Minnesota 55127
```



Page 97

```
 1      STATE OF MINNESOTA )
 2
        COUNTY OF RAMSEY   )
 3
 4                Be it known that I took the
        deposition of TIM LUNDQUIST on March 17,
 5      2021;
 6                That I was then and there a
        notary public in and for the County of
 7      Ramsey, State of Minnesota, and that by
        virtue thereof I was duly authorized to
 8      administer an oath;
 9                That the witness before
        testifying was by me first duly sworn to
10      testify the whole truth and nothing but the
        truth relative to said cause;
11
                  That the testimony of said
12      witness was recorded in stenotype by myself
        and transcribed into typewriting under my
13      direction, and that the deposition is a true
        record of the testimony given by the witness
14      to the best of my ability;
15                That I am not related to any
        of the parties hereto nor interested in the
16      outcome of the action;
17                That the reading and signing
        by the witness and Notice of Filing were not
18      waived;
19
                  Witness my hand and seal this
20      29th day of March, 2021.
21
22
                       LAURIE A. KJELDEN
23                     COURT REPORTER
24
25
```



**A**

**a.m** 1:18,19
  95:18
**ability** 5:4 97:14
**able** 9:23 88:13
**absolutely** 63:16
**account** 2:22 7:7
  7:11,16 12:18
  28:7 29:1,17,21
  29:22 30:15
  37:6 38:5 91:11
  91:13,21,23
  92:4,7,11,20,20
**accounting** 72:19
**accounts** 5:24
**accrued** 78:22
**accruing** 75:4
  76:10
**accurate** 31:25
  34:8,11 35:13
  35:14 72:12
  73:11
**action** 97:16
**actual** 14:19
  61:13 62:21
  63:13,23 76:22
  81:17
**add** 9:25 10:21
**addition** 59:6
**address** 3:15
  31:3,4,5 61:6
**administer** 97:8
**admissions** 82:7
**admitting** 41:13
**advised** 64:24
**advises** 64:21
**advising** 74:7
**affiliates** 35:19
  37:3
**AFFIX** 96:20
**ago** 24:8 25:2
**agree** 37:20
  45:14 62:25
  67:4
**agreement** 45:19

46:4,4,6,8 51:3
54:19 66:23
87:8 95:6,10
**agrees** 35:17
**ahead** 18:17
  22:10 24:4,17
  25:22 26:8,13
  33:15 34:18
  36:17,25 37:10
  37:25 41:18
  42:10,17 45:13
  45:25 46:22
  48:19 49:13
  50:6 51:7 62:16
  72:14 75:20
  79:9 83:3,13
  84:7,16 85:11
  85:23 91:18
  92:14
**al** 1:7 96:3
**allegation** 85:21
**alleged** 73:21
  75:17 76:2,15
  76:23 78:12
**allegedly** 81:18
  82:17 83:9
  86:22
**alleging** 73:14
**allowed** 19:4
**AMCO** 59:15,16
  59:17 70:21
**amount** 22:13,20
  26:11 36:3,8
  43:3 45:4 52:25
  61:4 63:23
  64:14 65:13,21
  67:6 68:25 70:3
  70:5 71:25
  72:11,11,16,18
  72:24 75:2
  77:14 80:10
  81:11 85:1,7
  89:21 90:18
**amounts** 37:19
  37:21,22 40:21
  41:1 43:25 44:8

45:23 46:17,18
51:13 52:3,5
53:15 54:20
55:21 57:16
67:6,8 75:7
77:6,10,11
84:13 85:3
87:19 93:3
**and/or** 96:7
**annual** 15:8,14
**answer** 3:24 4:5
  4:9,16 9:13,17
  12:21 15:10
  18:18 19:2,4,19
  22:10 24:4,17
  25:22 26:8,13
  33:15 34:18
  36:17,25 37:10
  37:25 88:1
**answering** 4:19
**answers** 40:5,6
**anybody** 24:21
  76:8 84:9
**anytime** 28:14
**APPEARANC...**
  2:1
**application** 2:22
  7:3,7,11,16
  28:7,14 29:1,6
  29:18,22 30:15
  35:24 36:21
  38:5,14 63:18
  92:19,21,22
**applications**
  36:22
**applied** 45:16
**approached**
  40:20 41:1
**appropriate**
  41:23
**approximately**
  1:18 6:22 53:17
**argument** 53:22
  75:10
**arguments** 45:20
  52:12 69:1

**aside** 14:15 33:25
  52:7 88:18
**asked** 53:6,8,9
  84:9
**asking** 43:24
  47:22 50:10
  52:11 53:5,12
  53:20,21 56:3
  64:19 68:21,25
**assigns** 35:20
**assume** 24:20
  29:11,23,25
  51:25 61:13
  66:17 90:4
**assuming** 32:7
  57:17
**attachment**
  56:18
**attorney** 36:13
**attorney's** 36:12
**authorities** 51:15
**authorized** 97:7
**auto** 10:7
**automatic** 6:5,8
  7:25 9:21 10:12
  13:15 55:11
  57:18 58:15,22
  88:21
**available** 26:2
**Avenue** 2:10
**aware** 50:11,14
  50:15 51:12,14

**B**

**back** 9:10 11:9
  11:10,12,16
  12:1,4,8,10,11
  12:23 13:2
  19:17,25 20:16
  21:1 28:13,24
  44:11 47:17
  62:1 66:15,19
  67:19 68:16
  69:6,11 75:8
  83:4 89:4,7
  90:16 93:25

**backwards** 72:5
**bad** 6:10
**ballpark** 15:13
  22:17 26:18
**banking** 31:25
**bankruptcy** 68:2
  68:10 70:9
  79:15,16
**banks** 25:20
**barbecue** 43:13
  43:14,17 44:4
**base** 6:14,14
  14:23,24 88:25
  93:23
**based** 9:18,22
  13:17
**basing** 7:8
**basis** 19:6 75:3
  88:21 89:2
**behalf** 2:8
  23:12 24:22
  28:10,11,12,15
  28:19 40:25
  44:19 48:14
**belief** 33:12
**believe** 49:23
  69:14 82:4 85:4
**believed** 40:21
  41:2 52:23
  55:21 59:12,23
  84:1
**believes** 69:4
  74:21
**benefit** 8:16
**best** 89:17 97:14
**bet** 63:18
**beyond** 17:19
**big** 61:7 71:21
  75:7 89:13
**bigger** 27:17
**biggest** 88:6
  89:12 90:9
**Bisgaard** 2:4
**bit** 5:7 27:20 35:3
  53:6
**Bkampman@z...**



2:12
**blow** 27:7 29:2
  31:21 32:20
  35:3
**blurry** 35:3
**Bob's** 10:5,24
  12:14
**books** 12:17 16:3
**bottom** 27:8
  32:21,24
**bought** 7:12
  13:12
**box** 32:23
**break** 4:11,17,19
  19:23 20:12,24
  47:10,13,21
  66:10,21 67:22
  67:24 86:3,4
  93:22
**Brian** 2:9 19:24
  20:24 64:16,17
  64:17,18 67:4
  95:10,15
**bring** 11:9,12
  12:1,10,23 13:2
**bringing** 12:4
**Brisbois** 2:4
**broad** 8:15
**broke** 68:21
**broken** 11:18
**brought** 43:17
  75:8 77:18
**buckets** 41:5
  52:16
**building** 87:12
**bullet** 34:2,23
**business** 3:15 5:8
  6:1,4,18 7:1
  15:3 23:16 24:9
  25:4 28:3,18
  30:9,18 33:25
  37:5 38:7,8,11
  45:5,23 46:20
  47:5 54:5,7
  55:3 63:4 64:20
  65:7 74:7 77:4

77:16 79:4,7
  86:1 89:5,14
  90:16,17
**buy** 7:23 54:18
  83:20
**buying** 7:17,19
  18:2,4 54:13,15
  63:5

---
### C
**C** 3:1
**calculator** 63:1
**call** 6:9 19:22,23
  20:4,10,13
  23:18 43:1,6,16
  43:20 53:1
  54:22 55:5,7,8
  58:1 66:5,8,12
  89:1 92:5 93:8
**call-in** 66:12
**called** 3:4
**calling** 66:2
**calls** 39:3,17,24
  40:4,7 43:9,21
  43:22 44:6,8
  48:3 55:1,22
  79:11
**Campbell** 2:3,20
  3:9 18:21 19:3
  19:6,10,14,21
  20:11,22 21:5
  22:12 23:9 24:6
  24:19 25:24
  26:10,17,24
  27:5,10,16,22
  28:22 29:4 30:4
  30:6,21,23 31:7
  31:10,19,23
  32:19 33:1,19
  34:22 35:6,8
  36:19 37:2,12
  38:2,4 41:22
  42:12,20 45:17
  46:2,24 47:16
  47:20 48:23
  49:17 50:9

51:10 56:8,13
  56:24 57:3
  62:20 66:1,7,21
  67:14,20 68:16
  68:20 72:17
  75:22 79:18
  83:6,16 84:10
  84:22 85:14
  86:2,8 91:22
  92:16 93:21
  94:3,9,10,18
  95:5,13
**car** 6:17 10:13
  11:2,9 59:11
  70:17
**care** 39:12 64:9
  82:9 83:24
**case** 16:17 20:21
  61:19 63:9,10
  96:3
**cash** 29:15,16
**cause** 90:25
  97:10
**causing** 73:17,18
**Central** 1:19
  95:18
**certain** 10:18
  45:3 65:21
  69:17 79:21
  81:11
**certainly** 45:8
  79:20 90:21
**certify** 37:4 96:6
**cetera** 78:23
**CHAI** 2:4
**chain** 86:18
**challenging**
  21:11
**chance** 56:14
**CHANGE** 96:8
**changed** 80:24
**changes** 96:7
**charge** 7:21 8:25
  9:1,2,11,12,20
  9:22 10:21
  11:10,15 12:8

12:13,15 13:8
  13:17 14:8 16:9
  18:4 42:5 62:11
  63:7,12 65:9,19
  65:21 71:18
  89:20 91:15
**charged** 13:16
**charges** 11:19
  17:4 36:11 41:6
  41:12,14 42:24
  44:21 45:4,10
  45:21 52:22
  53:10,18,24,25
  58:5 62:23
  64:12 68:22,24
  69:4,10 70:5
  71:15 84:24
  85:2,4
**Chaska** 32:9
**check** 56:4
**checked** 92:22
  93:1
**circumstances**
  82:7
**civil** 17:6,11
  66:25
**claim** 58:18 64:8
  73:24 78:24
  79:1,4 80:7,12
  81:15 82:11,12
  83:9
**claiming** 22:4
  61:1 77:11
  79:22 80:6,10
  81:10 83:11
  86:14 90:8,10
  90:18
**claims** 22:21
  77:20 86:11,13
  86:16
**classifying** 21:25
**clear** 18:11 20:17
  35:4 46:16
  68:23
**clearer** 34:20
**Cleveland** 2:6,11

**close** 67:14 95:9
**COD** 29:14 38:13
**coffee** 4:13
**colleague** 93:24
**collect** 36:14
**collection** 36:20
**come** 7:20,23
  10:11 19:17,25
  21:1 28:24
  47:16 60:8
  66:15 82:5 83:7
  87:7
**comes** 16:7 58:25
**coming** 35:2
**commencing**
  1:18
**communication**
  79:17
**company** 23:23
  35:12 36:2
**complete** 11:17
  59:24
**concern** 32:5
**Concluded** 95:18
**conference** 43:15
  78:16
**confidential** 19:9
  20:20
**confirm** 74:10
**consider** 13:7,8
  91:11
**considered** 12:24
**considering**
  46:11,13
**contact** 76:8
**contained** 35:23
**continue** 24:9
  47:5 54:5
**continued** 51:1
  84:2
**continuing** 46:20
  83:20
**contractors** 22:1
**control** 59:20
**conversations**
  87:5



40:1 61:5 74:8
76:3,6,17 78:3
80:17,23 81:4
82:10
**converters** 73:15
75:11 86:12
87:11,13
**copies** 78:14
**copy** 33:20,24
34:20
**Corby** 82:19
86:19
**core** 6:9 8:25 9:3
9:7,9,11,20,22
9:24 10:2,2,21
11:10,15 12:1,8
12:10,13,15,23
13:2,4,8,8,10
13:11,13,17
14:8 16:7,8,9
16:25 17:4,19
41:6,11,14
42:14,23 44:21
45:4,10,21
52:22 53:10,18
53:24,25 58:5
61:9,11 62:11
62:22 63:7,12
63:17 64:2,3,12
64:23 65:9,18
65:21 68:22,24
69:4,9,20 70:5
70:25 71:6,8,15
71:17 84:24
85:2,4 89:20
**cores** 16:21 61:20
61:22 71:10
**corner** 10:8
**Corporate** 3:16
**correct** 5:14 6:2
8:23 11:11 19:5
19:20 30:3,19
32:13 53:4
55:19 58:7,13
59:4 63:8 70:19
72:9 73:12 76:5

81:4,13 82:3
85:6
**corrections** 96:7
**correctly** 21:10
45:16
**cost** 36:20 63:6
80:1 83:1
**costs** 76:24 78:23
82:6
**counsel** 3:21 4:12
4:18 66:22
88:13
**count** 5:16
**County** 1:16 97:2
97:6
**couple** 91:7
**course** 28:18
51:19 61:5 65:7
74:7 75:5 77:4
77:15 86:1
**court** 1:1 4:1
19:15,22,23
20:4,10,13,14
20:23,25 21:2
21:14 56:16
66:5 94:8,13
96:24 97:23
**court's** 66:2
**courtroom** 83:8
**cover** 80:20
**coverage** 74:22
**create** 9:8
**credit** 18:4,7,10
23:24 29:6
35:23 36:22
38:13 41:15
60:7 61:11,25
62:8 64:1,2,23
65:11,13 78:8
84:4 91:10,14
91:19 92:2,3,18
92:22 93:8
**credited** 42:14
44:23 61:22
62:2 65:14
**crediting** 58:20

**credits** 41:20
42:1,5 61:10
71:10
**criminal** 66:25
**critical** 63:17
**cup** 4:13
**current** 3:15 53:9
56:7 73:1,2
**currently** 16:10
16:11,23
**customer** 6:14,14
8:8 10:5 13:5
14:22 17:3 57:6
58:12 59:5,17
59:18 70:5,22
70:24 79:24
88:6,25 89:13
90:10
**customer's** 11:2
70:17
**customers** 8:10
10:8 17:3 32:10
59:3 64:22 65:9
69:9 76:5 78:22
87:24 88:4,10
88:14 89:1,6
90:3
**cycle** 9:10

— D —

**D** 3:1
**D-E-M-I-L-L-E**
40:19
**daily** 75:3
**damage** 73:17
**damaged** 11:19
13:3 71:9
**date** 7:2 24:12
27:18,21,23
93:14 96:4
**dated** 27:25
96:21
**dates** 40:8
**Dave** 86:6
**DAVID** 2:3
**David.A.Camp...**

2:6
**day** 1:17 19:18
96:21 97:20
**deal** 47:1 86:18
86:19
**dealer** 6:17,17
**debt** 19:12
**debts** 25:16
**decent** 89:20
**decision** 11:21
**declaration**
56:15,19 57:11
**defaulted** 81:18
**defective** 78:12
79:1
**defendant** 19:11
20:5,8
**Defendants** 1:8
2:8
**defense** 23:3,8
**delay** 20:1,3
**delivery** 7:21
18:5 29:15,16
29:21 91:16
**demand** 36:8
**DeMille** 40:16,17
40:20,25 43:8
44:18 45:3 46:9
46:14,16,25
50:15 51:16
52:14,15 53:16
54:23 55:9,20
56:2 75:8 78:15
80:5 81:16
82:20 87:18
**DeMille's** 52:17
54:1 56:15
57:10
**denied** 64:7,7
**denying** 91:9
92:17,25 93:2,6
**depend** 13:5
**depended** 59:25
**depending** 11:24
63:17
**depends** 14:17

**deponent** 96:5
**deposition** 1:12
1:14 2:17 3:19
19:17,25 27:3
56:11 67:3 96:4
97:4,13
**depositions** 88:16
**detailing** 61:21
**determination**
42:13,19,21
**determine** 16:8
73:10 88:14
**different** 79:20
**direct** 18:2 60:3
65:1
**direction** 97:13
**disagree** 37:18
52:3 57:22
**disassemble** 6:11
**disclose** 24:22
**disclosed** 23:18
24:7
**disclosure** 18:15
18:25
**discovery** 55:16
**discretion** 59:19
**discussed** 43:7
**discussion** 45:2
47:24 87:9 95:6
**discussions** 47:4
51:15 52:14
54:9
**dispute** 23:19
25:17 48:2
49:21 50:12
52:1,4,6 60:20
60:22 64:14
68:24 69:2
71:24 72:10,16
72:18,20,23
**disputed** 69:10
**disputes** 17:3
18:12 25:19
55:15 65:2
**disputing** 62:5
64:2,12,22 80:9



**DISTRICT** 1:1,1
**DIVISION** 1:2
**document** 28:6
33:21 34:17
38:18 92:18
**documentation**
61:13,21 63:25
64:4,5 65:20
69:6,8,11 73:20
73:25 74:3,6,9
74:23 75:16
76:2,23 78:12
78:13,25 79:6
79:20 80:8
81:14,17 83:8
94:20
**documented**
77:14
**documents** 28:19
64:11,11 69:18
76:14 91:6
94:22
**doing** 3:24 4:4
7:1 10:6 16:24
21:13 25:4 28:3
45:23 46:11
54:9 72:23
90:17
**dollar** 53:15 61:4
**dollars** 26:22
62:13 75:14,17
77:12
**Don** 32:14 86:18
**Donohoe-Tech...**
2:14
**double-checked**
45:9
**drew** 70:11
**Drive** 3:16
**drop** 45:20
**due** 36:3 51:4
57:15 58:1
61:14
**duly** 3:4 97:7,9
**dumb** 63:3
**Dynotec** 5:10,11

6:1,3 7:1,13 8:5
8:8,12,21 10:11
11:1,3 12:6,13
12:24 13:6,8,16
13:23 14:3,16
14:22 15:8 17:2
17:6,15 18:12
18:19 21:7,9,11
23:4,11,18,25
24:7,14,22 25:7
25:11,14,16,25
26:5 28:2,11,16
28:19 29:16,20
30:9,13 34:5
37:18,20 38:11
38:12 39:1
40:20 41:1 46:5
47:1 48:12,16
50:22 51:13
54:11,13,15
55:12 57:13,19
58:11,22 60:1
60:20,21 61:20
62:4 63:24 64:4
64:12,20 65:7
65:24 68:10,13
69:3,7,14 71:3
71:24 72:2,7,7
72:10 73:9,13
73:22 74:3,3,6
74:20,21 76:1
76:12,13,14,22
79:23 82:4
83:20 84:12
90:7 91:9 93:3
93:7,12
**Dynotec's** 6:4
23:3 38:8 60:25
61:10 65:3 67:8
70:21 87:24

_____

**E**

**E** 3:1,1 96:1,1
**e-mail** 20:12,25
66:11,11
**early** 6:22 77:17

79:2 80:4
**easier** 3:25 32:22
**East** 2:5
**eastern** 1:2,19
86:5
**Ed** 86:20
**either** 25:19
73:18
**electronic** 94:16
94:16
**electronically**
94:11
**employ** 36:13
**employee** 5:12,19
16:14,16,21
22:5
**employees** 5:15
5:18 14:14,16
21:25 22:3
23:13 30:13
39:16 40:3
48:14 70:15
81:11 82:8
85:19
**ended** 55:5 90:2
**entire** 81:21,22
**entities** 14:11
18:7 88:8,19
**entity** 17:14
23:24
**equal** 63:19
**Escort** 10:14
11:7 12:3
**Especially** 4:5
**et** 1:7 78:23 96:3
**event** 36:2,12
**exact** 5:17 40:8
68:6 77:17
93:14
**exactly** 20:17
45:16 48:21
**Examination**
2:19 3:7
**examined** 3:5
**example** 11:7
48:12,15 80:21

**excess** 42:24
52:18 62:12
63:12 77:11
84:5 85:18
**executed** 7:11
38:6
**executing** 29:21
**execution** 29:17
38:13
**exhibit** 26:25
27:2,3,7 38:3
56:9,10,11
68:17,18
**Exhibits** 2:21
**expect** 71:17
**expenses** 85:25
**explain** 9:4 10:4
30:10 39:22
**explaining** 65:17
**explanation** 4:23
**expressly** 35:17
**extension** 35:23
**extra** 14:8

_____

**F**

**facilities** 6:16
**facility** 31:13
**fact** 24:1 74:25
**failed** 6:10 73:15
73:16 74:8,21
75:1,12
**fails** 36:3
**failure** 50:2
73:21 78:20
**fair** 8:22 40:11
40:24 41:8 42:7
42:25 52:20
67:11,12 83:7
**fairly** 54:10
**far** 9:14 29:19
44:11 64:16
**faulty** 61:2 76:18
83:11,19 90:23
**federal** 22:5,6,15
22:21 23:5,12
26:3 48:13 49:8

49:10,24 50:3
50:16 51:4,16
52:4,7 84:11
85:7
**fees** 36:12
**figure** 79:13 87:1
87:2
**filed** 56:16 68:2
68:10
**Filing** 97:17
**filled** 29:9
**final** 32:20 34:2
34:22 37:7
42:19,21 46:6,8
54:25 58:8
94:20
**finally** 50:23
57:24
**finance** 36:11
**finances** 51:5,9
**financially** 50:23
84:14
**find** 69:24,25
71:19
**fine** 94:11,12,15
94:17 95:12
**finish** 58:20,21
**finished** 8:20,24
9:1 62:21 63:6
63:13,24
**firm** 36:14
**first** 3:4,23 11:17
11:25 16:11
25:5 27:6 28:10
28:25 29:2,5
48:6,8 57:5
61:9 76:16 78:3
97:9
**five** 17:2 93:24
**flows** 14:11
**follow** 55:9
**follow-up** 86:10
88:12
**following** 96:7
**follows** 3:5
**Ford** 10:13 11:6



foregoing 96:6
foreman 11:24
    17:1
forgave 44:20
format 94:12
formatting 94:17
forward 20:6
    24:11 25:3 45:5
    45:22 47:4
found 37:21
frame 82:15
front 82:19
full 11:20 36:8
    42:14 65:12
funds 23:16
further 66:24
future 24:11
    46:19

---
G
---

G 3:1 96:1,1
games 20:2
gather 83:8
general 6:16 9:18
    12:16 16:14
generally 9:24
    16:22
gentlemen 87:10
getting 11:6
    12:11 20:2
    39:12,13,14
    63:1 74:19
give 3:22 4:8,19
    9:16 32:3 59:5
    59:7 61:20
    63:25 69:11
    73:20 78:8,14
    79:6 81:20 84:4
    87:24 88:7
    89:17 93:24
given 3:21 48:1
    69:3 75:3,5
    85:2 92:2 93:8
    94:21 97:13
gives 65:7 69:7
giving 12:7 23:24

41:15 65:24
    81:17
go 10:18,25 17:19
    17:23 18:17
    19:16,24 20:6
    22:10 24:4,17
    25:22 26:8,13
    27:6 28:22,23
    28:24 29:2 30:4
    30:21 31:19,24
    32:20 33:2,15
    34:18,25 35:9
    36:17,25 37:10
    37:25 41:18
    42:10,17 45:13
    45:25 46:22
    48:19 49:13
    50:6 51:7 55:3
    56:9,22 62:1,16
    65:2 66:24 67:2
    67:19,21 68:16
    72:14 75:20
    79:9 83:3,13
    84:7,16 85:11
    85:23 91:18
    92:14
goes 9:15 64:16
going 7:4,6 10:15
    10:18,21 13:21
    19:1,15,16,18
    19:24 20:4,6
    25:19 32:5 35:7
    35:9 39:21
    40:15 55:6 66:8
    66:10,18,24
    67:6 75:23
    81:20 82:9
    83:24 87:6 94:6
    95:16
good 35:7 67:23
    89:25 94:1
government 22:7
    22:22 23:5,12
    49:7 50:3,3
    51:4,17 52:5,7
    52:8 84:12 85:8

granted 42:6
green 57:20,22
group 77:23,24
groups 74:14
grow 38:7,9
growth 38:10
guarantee 37:6
guaranteed
    19:12 37:22
    93:3
guess 14:10 32:4
    44:19 46:10
    48:10 50:10,12
    50:20 51:13
    52:1 54:10,23
    56:17 70:2 81:9
    82:14 83:10,18
    84:23 85:1
    86:14 88:12
    89:16,17,23
    92:3,8,10 93:11
guys 20:1,2 43:13
    43:17 46:10
    47:14 55:2
    93:25

---
H
---

half 47:7
hand 8:5,8 78:11
    78:19 97:19
handed 77:8,21
    78:5,24
handing 81:16
handle 12:20
    60:2 65:1
handled 12:25
    30:2
handling 14:19
happened 80:1
hard 44:10 88:10
harmless 35:18
Hawthorne
    96:24
hear 41:11 47:12
heard 47:11
    77:25 82:13

held 21:4 47:19
    66:20 86:7 94:2
help 83:25
helping 94:23
hereto 97:15
hey 10:11 45:20
    54:17 64:1,22
    75:1
high 9:14 10:3
    70:4 92:11
hold 14:18 35:18
home 31:3,5
honest 9:16
honestly 12:21
hopefully 21:1
Hopkins 82:19
    86:19
hours 81:19

---
I
---

idea 15:24 44:15
identification
    27:4 56:12
impact 5:4
importantly 76:3
in-person 44:1,3
included 38:19
Including 36:11
income 12:24
    13:9 22:15,15
    23:4,11 48:13
    49:9,19,22 50:2
    50:16 51:18
    85:8
incorrect 61:16
incurred 80:2
indemnify 35:18
independent 22:1
individual 19:11
    20:5,8 69:9
Industries 1:4
    5:10 35:19 96:3
industry 28:15
    91:12
info 66:12
informal 25:18

information
    18:16 19:1,9
    20:7,20 23:7
    30:24 31:25
informing 64:13
    64:13 74:3
inspection 60:5
installation
    73:17
installer 91:2
instruct 19:1
instructions 3:22
interest 36:11
interested 47:1
    78:16 97:15
internals 6:11
investigation
    95:8
invoice 59:22
    76:16
invoices 74:12,14
    77:19 78:21
    90:20
involved 16:4,5
    17:6,10 18:12
    18:20 74:15
IRS 18:13,22
    19:19 21:7,9
    22:3,21 23:18
    25:5 48:1 66:24
    67:10
issue 21:8,17
    22:13,18 24:1,2
    24:22 25:6
    42:24 43:3 50:1
    54:24 57:5
    60:25 66:13
    67:15 71:9 80:3
    80:18 82:25
issued 60:6 65:13
issues 59:13
    66:14 76:3,6
item 72:25
items 64:25

---
J
---



**J-O-D-Y** 5:22
**James** 86:19
**Jim** 86:18
**Jody** 5:22
**Jordan** 3:16
  32:12
**judge** 47:11 66:8
  66:13,22
**July** 6:22 55:19
  73:5
**jump** 20:23,25
**June** 55:17 62:8

### K
**Kampman** 2:9
  18:14,24 19:5,8
  19:13,20 20:9
  20:19 21:3 22:8
  23:6 24:3,16
  25:21 26:7,12
  33:14 34:16
  36:16,24 37:9
  37:24 41:17
  42:9,16 45:12
  45:24 46:21
  47:15,18 48:18
  49:12 50:5 51:6
  62:15 64:18
  67:12 69:17
  72:13 75:19
  79:8 81:23 83:2
  83:12 84:6,15
  85:10,22 86:6
  91:17 92:13
  94:1,6,14,15
  95:12,16
**keep** 13:4 20:3
  23:16,22 76:14
  86:25 87:2 95:8
**keeping** 76:10
**kept** 12:15,16,17
  76:9
**kind** 39:11 91:12
  94:8
**Kjelden** 1:15
  96:24 97:22

**knew** 39:25 76:7
  86:24 87:5,6
**know** 5:16 7:18
  9:13,15,25 10:6
  11:23,24 12:19
  12:22,25 15:11
  15:19 18:8
  20:15 21:15,16
  22:17 23:2
  26:15 29:23
  33:10,22,23
  34:1 37:18
  38:11,12,15,16
  39:15,16,20
  40:3,17 42:3
  44:7,10,22,24
  45:1,15 47:12
  50:25 51:23
  53:12,14,19
  54:24 56:3 57:5
  57:23 60:14
  61:3,8,12,15,15
  61:16 62:25
  63:18 64:15,20
  65:1,4,5,6 69:7
  69:23 70:7,7,7
  70:9,11 71:19
  73:7 74:15
  75:25 76:7,9
  77:17 80:24
  84:8,17,18,25
  85:1,25 86:1
  87:5,14 89:5,15
  90:25 91:5 92:5
  93:7,14 94:5
**knowledge** 21:13
**known** 97:4

### L
**L-U-N-D-Q-U-...**
  3:14
**labor** 58:8,9 60:6
  60:13 64:7 74:1
  74:4 75:13,14
  75:17 78:22
  79:21 81:9 82:1

**82:6 83:1
**largest** 87:24
  88:4
**Laurie** 1:14
  66:16 96:24
  97:22
**lawsuit** 33:25
  48:7
**lawyer** 63:3
**lay** 79:23
**Leading** 22:9
**lease** 31:12,14,15
  31:16,17
**leasing** 31:11
**ledger** 2:22 73:2
  73:3,5,10
**left** 27:20
**Legal** 1:23
**let's** 8:13 10:4,5
  19:22 28:22,24
  30:4,21 31:7,19
  31:24 32:19
  33:2 40:14
  46:17 47:9 56:8
  56:9,22 58:21
  59:16 67:25
  68:16 71:20
  86:2 87:23
  93:22
**letter** 48:7,9
  55:17,23 80:15
  82:24
**letters** 51:19
**letting** 91:14
  92:11
**Lewis** 2:4
**liabilities** 21:12
  21:19,22 23:22
  66:25
**liability** 18:23
  24:15 26:3
  66:14 95:7
**limited** 55:13,13
**line** 8:16 32:22
  57:8,15 64:25
  70:11 72:25

**84:4 91:10,14
  96:8
**listed** 61:3 64:1
**litigation** 17:7,8
  17:10,11,12
  18:20 23:19
  25:15
**little** 5:7 16:5
  27:17,20 35:3
  43:4 44:20
  52:18,24 53:3,6
  56:22 79:16
**LLC** 1:4 96:3
**LLP** 2:4,10
**loan** 25:25 26:2
**loans** 26:5,11
**local** 49:7,18
**location** 30:8
**long** 6:25 66:17
  70:8 94:16
**longer** 86:4
**look** 9:16 12:6
  15:11 40:9
  47:10 56:8 57:1
  57:4 64:10 67:6
  74:1,14 90:6
**looked** 26:15
**looking** 15:5
  16:12 18:8,22
  24:10 28:13
  57:24 68:17
  83:4 84:12
  85:18 88:9,15
**looks** 40:7
**lot** 3:25 10:1
  20:14 21:1 62:8
**low** 9:14 54:12
**lunch** 43:17
**Lundquist** 1:7,13
  2:17 3:3,10,12
  3:13 5:22 6:7
  21:6 23:10 27:3
  27:11,23 29:7
  33:3 35:9,14
  56:11 67:1,7,21
  68:1 74:19 86:9

**94:19 96:3,5,18
  97:4

### M
**magistrate** 66:7
  66:13,22
**Magna** 1:23
**maintain** 33:20
**majority** 89:5
**making** 42:13,18
  50:21,24 72:8
  75:10
**man** 81:19
**management**
  11:22
**manager** 5:24
  11:23 16:22
**manufacturer**
  74:25
**March** 1:17 28:3
  96:4 97:4,20
**marked** 27:4
  29:5,9 56:12
**math** 62:18,24
**matter** 62:3
**max** 30:17
**max/min** 91:20
**Meagan** 2:14
  27:1,7,16 28:23
  30:22 31:8,20
  32:20 34:22
  38:3 56:10 57:1
  68:19
**mean** 9:15,19
  14:17 16:13
  21:23 34:19
  42:7,23 46:10
  48:11 49:8 50:7
  55:2,5 58:21
  59:9,16 62:4,5
  62:6,11 63:3
  64:6,8 70:14
  80:9,19 84:19
  85:17 86:15,17
  87:14 88:25
  89:20



Meaning 54:13
meant 91:23
medication 5:3
meeting 43:14,18
  44:1,4 82:21
meetings 39:3
  43:10 44:3
mentioned 55:16
Metzger 2:10
miles 59:1 81:2
million 22:19
  24:2 26:21
  62:13,19 63:22
  75:14,17 77:12
  85:18
mine 3:22
Minnesota 1:16
  3:16 10:9 14:23
  14:24 49:18
  96:25 97:1,7
Minnesota-bas...
  15:4
minute 24:8
minutes 21:2
  25:2 66:18
  93:24
moment 15:15,16
  18:8 34:21
  41:24 45:15
  65:4
momentarily
  67:24
money 12:11
  13:12,20 14:11
  20:3 61:14 85:9
  85:16
monies 13:21
monthly 88:21
months 53:10,14
  59:1,13 62:6
move 24:11
  27:19 29:20
  31:7 47:3
moved 25:3
moving 45:5,22
multiple 17:25

73:23 74:15
  88:20
multiples 89:7
mute 66:3

—————————
          N
—————————
N 3:1 96:1
name 3:11 5:21
  16:12 18:1
NAPA 32:8,9,12
nationwide 14:23
  15:1
necessarily 84:25
necessary 36:12
need 4:11,12,13
  4:18,20,23,24
  9:7,9 10:12
  14:2,4 17:20
  32:21 47:10
  66:9 67:22
  70:10,13 73:18
needed 7:24
  17:17
needs 72:25
negotiating 50:14
negotiations
  47:23 74:18
neither 49:15
network 6:17
never 12:10,11
  46:6 77:7,7,25
  81:14 84:9,20
  86:23
new 6:17 30:18
  54:14
Nick 32:9
nodding 4:6
non-cash 29:20
normal 54:10
  79:4 82:7 86:1
  94:11,12,17
North 96:25
NORTHERN 1:1
notary 1:15
  96:20 97:6
notice 1:13 48:2

48:6,8 69:3
  97:17
notification 65:8
notify 24:14
number 10:16
  14:5 27:4 48:16
  56:12 57:20,22
  58:8 60:8,11,15
  61:7,8,17 62:3
  62:5 70:12
  71:21 72:3 75:7
  77:17 89:15
numbers 15:6,19
  32:25 60:17
  70:10 88:9

—————————
          O
—————————
O 3:1
Oaks 96:25
oath 97:8
Objection 18:14
  18:24 22:8 23:6
  24:3,16 25:21
  26:7,12 33:14
  34:16 36:16,24
  37:9,24 41:17
  42:9,16 45:12
  45:24 46:21
  48:18 49:12
  50:5 51:6 62:15
  72:13 75:19
  79:8 83:2,12
  84:6,15 85:10
  85:22 91:17
  92:13
obligations 11:14
obviously 9:7
  14:17 59:9 87:4
occur 62:7
occurred 84:18
office 5:24 31:12
officers 30:25
offset 73:13,14
Ohio 1:1 2:6,11
okay 3:10,18,21
  4:9,10,14,15,21

4:22 5:1,3,18
  6:3,6,13,18,25
  7:19,23 8:18
  9:4,11 10:9,24
  11:6 13:6,14,20
  14:14,14,21,25
  15:7,7,23 16:6
  16:24 18:4,10
  18:22 19:14,21
  20:9,11,22,22
  21:3,11 22:13
  22:24 23:1,24
  24:20 26:24
  27:5,9 28:8,17
  28:21 29:13,16
  29:20,25 30:4,5
  30:18,20 31:3,6
  31:6,17 32:3,8
  32:19 33:7,9,20
  33:23 34:2,8,13
  35:1,17 37:17
  38:10,16 39:3,6
  40:6,13 41:10
  42:4,21 43:22
  43:24 44:6,18
  45:8,18 47:3,9
  47:17,21 48:10
  48:24 49:18,21
  50:20 51:1,3,11
  51:21 52:1,10
  53:3,5,16,20,23
  54:7,17 55:9,15
  55:25 56:4,6,6
  56:14,21 57:10
  57:14,15 58:23
  58:24 59:2,11
  59:21 60:8,25
  62:4 63:21
  64:19 65:5,16
  65:17 68:8,12
  68:15,15 69:6
  69:14,20,25
  71:5,12,20,20
  72:5,10 73:13
  73:20 75:10
  76:22 77:2,10

77:14,22 78:5
  78:10,24 79:3
  79:19 80:6 81:3
  81:14 86:2,5,22
  87:2,18,22,22
  88:12 89:9,11
  89:17,19,23
  90:6,14 91:4,4
  92:8,17 93:5,16
  93:21 95:4
okayed 39:21
old 73:4
one-offs 89:1,4,7
ones 14:4 70:15
ongoing 54:8
  74:11
online 4:5
open 54:17 59:9
  91:11,13,21,23
  92:4,6,11,20
  95:9
operating 85:25
opportunity 4:20
orange 58:2
order 7:24 11:15
  62:24 76:5 80:2
  94:3,5,24
orders 67:5
ordinary 28:18
  64:20 65:7 74:7
  77:15
Orzetti 86:20
outcome 97:16
outstanding 26:3
overhauled 73:19
owe 75:2
owed 37:19,21,23
  40:22 41:2
  43:25 44:8
  45:23 46:18,18
  48:16 51:13
  52:6,23 54:20
  55:21 57:16
  65:21 67:8,9
  69:4 84:13 85:4
  87:19 90:19



93:3
**owes** 82:6
**owing** 49:22
**owner** 59:12
68:12

**P**
**P** 3:1 96:1
**page** 2:19,21 27:6
28:23,24 31:20
96:8
**paid** 5:11,13
22:21 46:19
49:6 50:17
51:18 54:1 72:1
81:12 85:7,13
85:19
**paperwork** 12:20
13:1 78:18
**paragraph** 34:14
**part** 32:11 33:6
56:25 61:23
65:10 69:22
81:17
**partake** 16:3
**partial** 42:15
49:3 69:12
**partials** 49:15
**particular** 18:18
**parties** 25:20
45:5,18,22
46:20 47:3 54:4
97:15
**partner** 57:6,25
**partners** 30:24
45:6
**parts** 7:24 8:6
17:15,18,20
60:19,22 61:1,3
78:23 81:19
82:25 83:1,10
84:5
**pay** 7:20 10:18
12:14 14:4 22:6
23:4,11 36:3,7
48:12,17 50:2

84:14 91:15,24
**payable** 5:25
**paychecks** 22:5
**paying** 25:11
38:12 84:5,11
84:20
**payment** 13:24
50:21 51:17,20
93:13
**payments** 6:24
32:6 48:22 49:1
49:4 50:24
60:13 78:22
84:19
**payroll** 21:19,22
21:24 22:20
25:6,11 50:25
85:25
**penalties** 22:14
22:24 23:1 67:9
**people** 74:15
79:12
**percent** 15:5
89:18
**percentage** 15:3
89:14
**performed** 73:22
74:4 75:2 76:4
**personal** 20:7,18
33:11 66:14,24
95:7
**personally** 18:23
19:11 37:5,22
44:22 50:13,15
51:12 67:7 68:2
93:2
**petition** 21:12,13
**phone** 32:24
38:22,24 39:3
39:17,24 43:9
43:16,20,21,22
44:6,7 48:3
54:22 55:1,22
79:11
**pick** 10:13
**piece** 8:18,19

**Plaintiff** 1:5 2:2
**plans** 24:14
**plant** 78:4
**play** 20:1
**please** 3:10 8:7
96:23
**point** 4:11 7:14
7:15 12:19
21:15 24:10,18
34:2,23 38:6
46:19 49:1,4
54:16 56:3
67:15 86:23
87:8 88:6
**points** 56:6 86:10
**portion** 15:2
83:10
**position** 5:23
14:17 16:20
52:17 54:2
60:11 61:11
65:3 71:6,7
**possibly** 63:19
**post** 67:2
**PPP** 25:25 26:2,5
26:11
**practice** 79:4
**predecessors**
37:3
**prefer** 4:16
**PRESENT** 2:13
**presented** 54:24
**president** 31:1
**presumably**
17:17 49:10
81:22 91:1
**pretty** 89:25
**previous** 36:22
**price** 10:2,18
**pricing** 9:14
**primary** 6:13,14
**principal** 34:4,24
35:11 37:5
**principals** 36:7
**print** 27:8
**prior** 25:9 28:3

29:17 30:10
32:17 43:15
48:3 50:14
51:15,24 55:22
87:22
**private** 18:15,25
19:8 20:7,19
**privileged** 23:7
**probably** 30:16
33:10 60:21
62:14 66:16
71:25 92:8 94:4
**problem** 24:11
81:1 86:25
**problems** 10:8
39:9 40:1 61:6
74:13 77:18
87:16 90:2
**proceeding** 21:7
21:9
**process** 6:7 33:5
64:6 69:23
71:14
**produced** 41:20
76:20 94:25
**product** 6:12
8:16 9:1,3,8,9
11:19 13:23
53:25 54:14,16
62:21 63:6,13
74:20,21 75:1
76:15,18,25
78:13 79:1,21
79:25 83:19,21
91:25
**production** 38:18
94:21
**products** 8:9,12
8:20,24 41:5
43:4 52:17
54:18 57:12
58:10 63:24
70:21 82:2 88:8
88:17 93:17
**projection** 15:20
**promise** 82:15,22

82:25
**promises** 82:21
**properly** 44:23
**proposal** 46:9
**proposing** 53:21
**protective** 67:5
**prove** 62:1
**provide** 74:23
**provided** 77:3
81:23
**public** 1:15 96:20
97:6
**pull** 38:2 56:25
**purchase** 7:14
8:5,9,13,20
9:24 11:1 31:14
55:10 63:23
72:11,24 84:2
89:10
**purchased** 8:24
13:18,23 41:5
57:12 60:19,22
62:9 73:16
76:16 79:25
88:8,20 89:6
**purchases** 43:4
52:16 53:25
54:10,11 57:25
62:12 63:22
71:20 72:1,7,8
89:21 90:7,22
93:17
**purchasing** 13:14
57:17 87:16
**pursuant** 1:13
**put** 10:25 11:1
26:25 27:1
45:19 56:10
61:25 62:3
65:19 66:3
75:13 81:19
89:15 94:23
95:3
**putting** 65:18
70:16



**Q**

question 3:25
  4:16,24 8:15
  18:18 19:2,4
  40:2,2 51:11
  64:10 65:23
  70:14 79:19
  83:19
questions 94:20

**R**

R 3:1 96:1
raise 66:13
raised 25:5 50:1
Ramsey 1:16
  97:2,7
ran 50:25
range 53:2
rate 55:13
Raybestos 18:3
reach 54:19
reached 46:5
  66:23
read 33:4,7,9
  34:7,20 35:21
  35:25 36:5,9,15
  36:23 37:7 94:5
  94:7 95:14,17
  96:6
reading 34:3,6
  37:13 97:17
ready 46:7
Real 65:17
realize 19:10
really 8:15 42:4
  70:10
reason 96:7
rebuild 8:17
rebuilding 9:6
  14:20
recall 21:10
  30:16 34:3
  37:13,15 38:20
  44:5,18 55:24
  55:25 68:6
receipt 91:24

receipts 57:25
receivable 5:25
received 62:2
receiving 55:17
recess 21:4 47:19
  66:20 86:7 94:2
recognize 27:11
recollection 28:2
  33:11 48:10
  49:5,25 86:17
record 3:11,13
  4:21 18:11 66:9
  68:23 71:12
  90:21 97:13
recorded 39:4,7
  39:24 43:23
  44:7,13 97:12
recording 39:16
  40:4
recordings 38:19
  38:22,24,25
  41:10
recovered 50:23
referenced 43:13
references 32:4
refuses 36:3
regardless 61:25
  63:21 93:7
regards 39:25
regular 89:2
reject 13:2,7
rejected 65:9
  69:21 70:6
related 97:15
relationship 8:3
  8:19 13:21
  14:12 24:23
  32:15 75:6 77:5
  79:7
relationships
  7:10
relative 97:10
relevance 20:21
remain 67:16
remainder 53:24
remanufactured

7:25 9:21 10:12
  13:15 14:3,5
  17:18 55:11
  57:18 58:15,22
  70:16 88:20
  89:3,10 90:1,22
remanufacturi...
  6:5,8
remember 7:2
  25:8,10 28:13
  29:19 34:6
  37:16 43:2
  44:10 47:24
  48:4,9,20 53:1
  53:15 55:6
  88:11,22,23
renew 6:11
renewed 6:12 9:8
repair 6:16 10:7
  80:2
repeat 4:24 88:4
replacement
  73:19 76:24
  81:3
replaces 36:21
replacing 11:7
replenish 13:11
reported 91:1
reporter 4:1 94:8
  94:13 97:23
reports 78:20
repurchase 13:13
required 91:15
resolution 39:10
  39:11 74:13
  79:13 86:23
respect 25:6
  38:10 39:1
  43:25
response 65:23
  71:18
responses 55:16
responsibilities
  34:15
responsible 67:8
restaurant 43:14

return 10:2 11:3
  11:4 13:4 45:4
  45:21 46:18
  54:4 65:19
  70:24 71:2
  96:23
returned 9:3
  10:1 16:9 41:7
  58:5 60:5 61:16
  61:20 69:21
  71:7,8,11
returning 64:3
returns 21:18
  61:16
revenue 15:8,14
  15:25
review 16:21
  17:1 56:15
  61:12 94:21
reviewed 72:25
  92:18
reviewing 16:7
  71:15 73:9
  87:19 95:2
Rick 77:19,23
  86:20
right 8:6,10
  10:16 12:2
  13:25 14:6
  15:10,19 17:21
  22:19 24:12
  26:15 27:19
  35:7,13,21,25
  36:5,9,15,23
  37:8 38:22
  40:22 41:16
  42:15 43:11
  44:1 45:11 47:6
  48:9 49:11 53:7
  55:18 58:6 59:3
  59:8 60:14,23
  61:4 62:9,13
  65:21 66:10
  70:18,22,25
  72:1,2,8 73:6
  74:4 75:24

77:12 79:1 81:9
  82:4,5 85:5
  88:2 89:21,22
  90:3,23 91:25
  92:9,12,23 93:9
  95:15
rights 67:2
Robinson 32:14
  86:18
role 17:14,24
room 43:15
  78:16
rounds 26:5
run 84:4
runaround 74:16
running 23:17,23

**S**

S 3:1 96:1
salary 5:12
sales 14:19 15:18
  15:21 57:6
  90:12
salesperson
  32:16
salvage 6:16
sand 70:12
saw 38:17,18
saying 19:7 20:18
  30:1 46:15
  52:15 53:23
  54:17,23 65:20
  73:9 81:8 82:24
  84:1,14 85:19
  90:15
says 30:7 34:23
  35:17 57:6
Scott 82:18 86:19
screen 4:7 27:19
seal 96:20 97:19
second 19:18,25
  66:2,4
Secondly 4:4
section 28:25
  29:2 30:5,22
  31:8 32:20,24



34:25
**sections** 31:21
**see** 4:7 20:13
26:24 27:18,20
27:23 29:6
32:22 34:24
35:1 40:8 56:18
56:23 57:5,7,20
58:3 64:11
69:18 75:16
88:16 89:19
**seeking** 51:17
**Seeks** 18:14
**sees** 11:24
**segregated** 12:17
**sell** 6:12 10:16
58:17 59:2
**seller** 74:25
**selling** 9:20 17:15
70:20,20
**sells** 8:10
**send** 9:8 42:1
59:22 74:6 80:7
80:11,13,14,15
82:24 90:16
**sending** 51:19
74:2,12 76:1
**sense** 82:23
**sensitive** 18:15
18:25 19:9
20:20
**sent** 41:20 60:2,3
73:3 74:13
77:23 83:5 90:1
**sentences** 37:7
**Services** 1:23
**set** 67:21
**settled** 39:9
53:19
**severe** 73:17
**shame** 92:10
**shareholder** 34:4
34:24
**shareholders**
35:11
**ship** 15:1

**shipping** 11:23
14:18 16:22
**shop** 11:23 17:1
**short** 23:16 47:10
93:22
**show** 7:4 78:20
**showed** 76:16
**showing** 76:15,23
**shows** 82:1
**shuffled** 39:14
**side** 12:20 13:1
64:9 65:15
**sides** 70:11
**sign** 28:10,12,18
33:4
**signature** 27:9,12
27:14 32:22
34:3
**signed** 7:16 28:6
28:9 30:14
**signing** 33:9,17
97:17
**similar** 84:11
**simple** 6:7 8:4
63:2 65:17
**simply** 51:12
84:13
**sitting** 87:15
**situation** 59:25
69:13
**six** 62:6 79:7
**skimmed** 33:17
37:14
**small** 15:2 27:8
75:7 77:6,10,14
**Smith** 2:4
**sold** 58:11,11,22
59:10
**sole** 68:12
**solve** 23:22 24:9
79:12
**solved** 24:12 25:3
**somebody** 9:4
12:23 82:14
**sorry** 40:23
**sort** 11:19

**sound** 41:13
**sounded** 41:12
42:4
**Sounds** 94:1
**space** 31:12
**speak** 4:13 5:1
55:20 56:1
**speaks** 34:17
**specific** 82:1
**spell** 3:13
**spend** 92:6
**spoke** 66:22
**stack** 81:21,23
**stamp** 46:7
**start** 7:10 9:7,10
50:21,22,24
51:21 55:10
58:20,21
**started** 30:7
51:22 77:18
79:15 81:1
87:12
**starting** 7:14
30:18
**starts** 35:10
**state** 1:16 3:10
4:20 49:7,10,19
49:20,21 50:3
50:16 52:7 97:1
97:7
**statement** 8:22
34:8,11 40:11
40:24 41:8 42:7
42:25 52:20
65:25 67:11,13
**statements** 87:20
**STATES** 1:1
**stating** 57:11
**stenotype** 97:12
**stock** 60:1
**stopped** 54:7
**Street** 2:5
**strongest** 14:24
**stuff** 15:1
**subject** 67:5 95:5
**submitted** 41:14

64:15
**subsidiaries**
35:20 37:4
**substance** 40:14
**subtracted** 65:14
**successors** 35:20
**Suite** 2:5,11
**supercedes** 36:21
**Superior** 2:10
**supplier** 32:11
54:18 58:1
79:24 80:15
84:3
**suppliers** 18:2
**support** 79:1
**suppose** 80:13
**supposed** 11:10
13:22 14:7
**sure** 3:21 33:16
35:4 44:25 45:1
94:4
**surprised** 41:11
**surprisingly** 70:4
**sworn** 3:2,4 97:9

_____
**T**
_____
**T** 96:1
**take** 4:19 6:9
11:8 19:22
20:12,23 28:17
47:10,13 66:3,8
66:10 67:24
75:23 82:9 86:2
86:4 88:16 90:8
93:22
**taken** 1:13,14
17:14,23 39:11
64:8 83:24
**talk** 4:12,18
24:20 40:14
55:6 67:25
71:21
**talked** 71:23
**talking** 53:14
73:24 74:17
**tape** 39:4,7,16

40:4
**tax** 18:12,20,23
21:11,14,18,19
21:22 22:14,15
22:15 23:4,22
24:15 26:3 48:2
48:22 49:1,21
66:14 95:7
**taxes** 21:24 22:5
22:20 23:11
25:6,11 48:13
49:9,19,22 50:2
50:16 51:18
85:8
**taxing** 51:14
**TECHNICIAN**
35:2 47:9
**tell** 6:3,6,6 15:17
18:9 46:25
64:25 83:22
88:3,9,24 90:7
94:25
**telling** 19:3
**Tennessee** 78:4
**terms** 6:7 8:4
63:2 64:19 70:3
91:20,20
**test** 6:11
**testified** 3:5
**testify** 5:4 97:10
**testifying** 97:9
**testimony** 96:6
97:11,13
**testing** 14:19
**Thanks** 20:14
21:1 68:19 86:6
**theory** 71:4,5
**thereof** 97:7
**thing** 20:3 25:2
**things** 33:4 62:7
91:7
**think** 4:17 5:17
7:3 19:14 22:19
23:25 30:13
35:6 40:13 41:4
41:23 43:6,13



44:12,24 45:8
49:3,14 51:22
53:6 55:19
62:18,21 63:5
66:1,16 68:6
71:22 72:5 73:1
73:8 78:2,2
79:3 80:14,25
82:20 83:7 86:3
86:20 87:13
92:1 93:22
**third** 25:20
**third-party**
36:14
**thousands** 88:10
**three** 30:16 44:15
81:1 87:25
**throw** 48:15
**Tim** 1:7,13 2:17
3:3 18:17 22:10
24:4,17 25:22
26:13 33:15
34:18 36:17,25
37:10,25 41:18
42:10,17 45:13
45:25 46:22
48:19 49:13
50:6 51:7 62:16
72:14 75:20
79:9 83:13 84:7
84:16 85:11,23
91:18 92:14
95:14 96:3,5,18
97:4
**time** 19:25 21:4
23:23 25:5
30:14 31:1,4,11
32:1,11 34:6,9
35:15 38:6
40:13,23 41:4
43:1,5,8 46:3
47:19 52:10,13
52:19 54:1,8,9
54:13 66:20
80:24,25 82:13
84:18 86:7

93:11,12 94:2
**timeline** 7:18
**times** 10:1 73:23
**timing** 29:24
30:1
**Timothy** 2:4 3:12
**Timothy.Chai...**
2:7
**title** 16:20
**today** 5:15,17,18
6:1,15,19 16:24
17:1,23 25:12
33:25 34:11
51:1 67:15
71:12,13 89:5
95:9
**told** 25:14 83:23
**Tom** 40:17 75:8
78:15 80:5
82:20 86:15
**top** 22:24 23:1
29:1 31:21 57:8
87:25
**torque** 61:5
73:15 74:8
75:11 76:2,5,17
78:3 80:17,23
81:4 82:9 86:12
87:10,12
**total** 26:11 42:23
43:21,24 62:12
64:14 72:24
**touch** 93:23
**tough** 9:13
**track** 76:10
86:25 87:2
**tracking** 90:4
**traction** 77:7
**transcribed**
97:12
**transcript** 94:9
96:6
**TransGo** 18:3
**transmission**
6:10,10 8:5,17
9:6,21 10:6,13

10:19,25 11:4,8
11:13 12:2,3,14
13:17 14:20
17:15,18 59:3
59:12 60:1
61:17 63:4
73:18 91:2
**transmissions**
6:5,8 8:1 9:5
10:7 13:15 14:3
14:5 55:11
57:18 58:15,23
62:9 70:17
88:21 89:3,11
90:1,23
**Transtar** 1:4
6:18,25 7:1 8:3
8:6,9,19 13:14
13:24,25 14:2
17:7,12,19,20
24:23,24 28:3
29:10,11 32:14
32:16 35:18
36:4,8,13,22
37:21 39:1,15
39:15 40:3,21
40:22,25 41:2,2
41:6,15,21 43:4
44:19 45:11,20
46:5 52:2,4,8
52:10,16,23
53:13 54:11,14
54:15 55:10,21
56:1 57:12,16
57:17 58:1,9,11
58:12,18,23
59:2,21,23
60:23 61:21
63:25 64:13,21
69:18 69:3,7,8
69:21 70:8,15
70:20,22,24,25
71:2 72:1,2,8
73:4,16 74:2,6
74:8,24 75:9,13
75:15 77:4,15

77:19,24 78:8
78:21 79:12,22
80:7,25 82:5,8
82:19 84:13,21
85:2,4 88:1,5,5
88:18 89:12,13
89:24 90:6,9,11
90:15,19,21
91:10 92:10
93:8,13,17 96:3
**Transtar's** 17:14
58:6 59:19
60:10 64:9
65:15 75:23
**tried** 78:14 80:4
**trip** 78:3
**triple** 62:14
**true** 97:13
**truth** 97:10,10
**truthful** 40:5,6
**truthfully** 5:5
**try** 39:11 67:17
87:1,2
**trying** 23:16,22
24:9 25:3 35:4
39:8 54:19 61:6
74:12 78:19,20
79:12,13,13
**two** 14:11 26:9
30:8,9,12,16
31:8 39:7 41:4
41:6 43:9,21,22
44:7,13,15
46:20 52:15
54:4
**type** 8:12 58:25
65:8 69:8
**types** 28:19
**typewriting**
97:12
**typical** 9:11 15:7
15:9 33:5
**typically** 8:13
14:22 33:3
58:16

**U**

**U** 96:1
**ultimately** 43:9
44:19
**undersigned**
34:23 35:10
36:2,7
**understand** 4:2
4:25 8:4 9:5
24:1 31:9 34:14
39:22 46:14
52:2 61:24 63:4
70:14 75:10,12
81:15 84:24
91:7,8
**understanding**
28:9 42:23
60:10 89:25
**unfortunately**
83:22
**UNITED** 1:1
**unlimited** 81:1
**Unpaid** 21:24
**unresolved** 65:2
**Unsettled** 6:24
**user** 59:8,11
**utilize** 7:24

**V**

**valid** 25:17 41:14
**value** 9:25 11:20
**vehicle** 11:5
**vendor** 60:4
**vendors** 17:25
23:19 24:15,21
25:19
**verbal** 4:8 45:2
46:4 73:24
86:11,13,16
**verbally** 4:5
**verified** 61:18
70:10,13
**verify** 32:5 33:2
52:13 57:23
60:16
**verifying** 60:15



versa 14:2
vice 14:2
Videoconference
  1:12
view 58:6
viewed 92:4
views 91:12
virtue 97:7
visual 11:17
voice 38:19 41:10
vs 1:6 96:3

**W**

W-2 5:13
wages 5:13
wait 3:24 60:4
waive 45:3 46:16
  52:12 53:17,23
  68:25
waived 44:20
  45:10 53:7,9,10
  97:18
waiver 53:13
waiving 67:1
want 20:1 52:12
  57:4 75:16
  81:21 86:9
  88:15 91:6
  93:23 94:19
wanted 39:10,20
  39:24 40:5,6
warranty 39:8
  40:1 58:8,10,14
  58:18,25 59:6,7
  59:10,14,18,24
  60:3,6 73:21
  74:1,4,22 75:13
  75:13,17 76:23
  79:21 80:10,17
  80:20,22,22
  81:6,9 85:20
  86:11 90:11,17
wasn't 11:13
  49:3 76:1
way 48:5,11
  50:13 61:24

84:20 86:17
91:12
ways 13:22
we'll 7:4 19:23
  20:13,16,23,25
  21:1 28:24
  47:12 66:12,15
  66:16,18 67:14
  67:16,18,24
  86:3 87:1 93:25
  94:3,5 95:8
we're 9:6 12:7
  18:2 19:15,24
  20:6 35:7 57:24
  62:5,6 64:2
  66:18,23 67:1
  85:17 93:22
  94:6 95:16
we've 20:4 66:23
  95:13
week 50:25
weekly 75:3 89:2
went 70:8 74:16
  79:14
weren't 62:7
  87:16
wife 5:19 14:15
  16:1,13 30:1
  41:13 45:9 48:2
  53:5 56:1 60:16
  71:14
Wilemon 77:19
  82:20 86:19,20
willing 53:17
withheld 22:4
withholdings
  49:9
witness 3:2,4
  18:19 22:11
  24:5,18 25:23
  26:9,14 33:16
  34:19 36:18
  37:1,11 38:1
  41:19 42:11,18
  45:14 46:1,23
  48:20 49:14

50:7 51:8 62:17
  72:15 75:21
  79:10 83:4,14
  84:8,17 85:12
  85:24 91:19
  92:15 97:9,12
  97:13,17,19
word 75:24 77:25
words 12:2
work 5:9 10:4
  47:14 55:2
  58:14,19 59:14
  59:18,20,21,24
  67:16 73:21,22
  74:9,10 75:1
  76:4,24 80:10
  81:11 82:1
  85:20 86:11
  90:11,17
working 11:13
  32:17
works 47:15,18
worth 77:20
wrapped 93:23
writing 29:12,13
  45:19 57:1
  79:24 85:3
writings 65:3
written 61:21
  65:8,24 76:1
www.MagnaL...
  1:24

**X**

X 74:8 75:2
X-Y 17:20

**Y**

Y 2:4
yards 6:16
Yeah 31:18 32:25
  33:8 64:15 68:9
  70:1 78:7 80:13
  85:24 87:4
year 14:12 15:9
  25:7 48:25

51:22 68:6 78:1
  81:1
year's 15:20
years 15:18
  16:18 17:2 21:8
  30:8,10,12
  39:10 50:4,17
  51:24 61:5
  74:16 79:7,14
  90:10
yellow 57:7
Yup 10:10 56:5
  63:16 92:24

**Z**

Z 17:20
zero 54:12 65:12
  69:12
Ziegler 2:10
Zoom 1:17 2:2,8
  2:13

**0**

**1**

1 2:22 27:2,4,7
  28:23,24
1.5 22:19 24:2
10 16:18 21:2
  66:18
10-minute 47:13
10-plus 14:12
10,000 92:6
10:15 47:17,18
10:44 95:18
100,000 44:21
  45:21 46:17
  53:7,8,17,24
1000 2:11
11:30 86:5
1111 2:10
1375 2:5
15 49:25
16 50:1
17 50:1 96:4 97:4
17th 1:17

18 59:1,13 80:4
18,000 59:1
1989 10:14

**2**

2 2:22 27:6 56:10
  56:12 68:18
20 5:17,18 48:17
  96:21
200,000 42:24
  52:24 53:3
2000 68:7,8
2007 7:3
2009 8:13 28:4
2013 21:10,17
  22:15 23:11
  48:11,12,21
  49:3,15,25
  50:17 51:21
  52:6
2014 49:25
2015 78:2,5,13
2016 87:23,25
  88:15,18 89:11
2017 21:10,18
  22:16 23:12
  50:18 52:6
  87:14 93:17,18
2018 25:9 40:10
  40:16,24 42:8
  43:24 44:9 47:5
  47:22 50:11,12
  50:13,22 51:16
  51:24 52:11,13
  55:22 78:15
  82:16 87:13,18
2019 17:17 47:6
  58:23
2020 6:22 8:14
  17:17 47:6,7
  55:17,23 73:6
  93:15
2021 1:17 96:4
  97:5,20
2250 2:5
25,000 48:16


MAGNA
LEGAL SERVICES

**26** 28:4
**27** 2:22
**27,000** 74:2 75:15
**27,831.81** 60:12
**29th** 97:20

---
**3**

**3** 2:20
**3-26-2009** 27:25
**30** 89:18
**300,000** 63:22
**324** 85:1
**324,000** 62:11,12
  84:23
**324,891.27** 58:2
  61:10 68:22
  69:15

---
**4**

**44114** 2:6,11

---
**5**

**5** 66:18 96:24
**55127** 96:25
**55352** 3:17
**56** 2:22

---
**6**

---
**7**

**70,000** 77:20 78:8
  78:25
**700,000** 43:5
  52:18 84:5
**728,000** 72:3
**728,465.65** 60:20
  71:22 73:10
  83:9

---
**8**

**8:00** 1:18
**80-plus** 15:5
**866-624-6221**
  1:24
**875** 3:16

---
**9**

**9:00** 1:19
**9:23** 20:24
**900,000** 79:5
**9th** 2:5

